**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | | |
|---|---|---|
| DIRECT BIOLOGICS, LLC | ) | |
| | ) | |
| *Plaintiff*, | ) | |
| | ) | |
| v. | ) | Case No. 1:22-cv-00381-LY |
| | ) | |
| ADAM MCQUEEN, | ) | |
| VIVEX BIOLOGICS, INC., and | ) | |
| VIVEX BIOLOGICS GROUP, INC., | ) | |
| | ) | |
| *Defendants*. | ) | |

## PLAINTIFF'S ORIGINAL COMPLAINT

Plaintiff Direct Biologics, LLC ("Direct Biologics" or "Plaintiff") files its Original Complaint ("Complaint") against Vivex Biologics, Inc. and Vivex Biologics Group, Inc. (collectively "Vivex" or "Defendant Vivex"), and Defendant Adam McQueen ("McQueen" or Defendant ), and respectfully would show the Court as follows:

### I.       INTRODUCTION AND NATURE OF THE ACTION

1.       This lawsuit seeks emergency and preliminary injunctive relief to enforce a key executive's valid and unambiguous contractual non-compete covenants, and to protect a pioneering biomedical company's confidential information and trade secrets pursuant to its contractual rights and state and federal law.

2.       Plaintiff Direct Biologics seeks immediate relief: (1) to enjoin Defendants Adam McQueen, its former employee, and McQueen's new employer Defendant Vivex, Plaintiff's direct competitor in the marketplace for regenerative biologic treatments, from continuing their employment relationship in flagrant defiance of McQueen's express contractual obligations; and (2) to prevent Defendants' further misappropriation, misuse, and disclosure of Plaintiff's

Confidential Information and trade secret information that McQueen received through his relationship with Plaintiff, and has retained, used, and disclosed to Vivex in violation of McQueen's contractual obligations and Texas and federal law.

3.      Plaintiff originally filed suit seeking emergency injunctive relief against Defendant McQueen in Travis County, Texas state court on April 20, 2022. Later that day, Plaintiff received confirmation that McQueen possessed and was still accessing computer files containing its confidential information and trade secrets, and furthermore, that he was spoliating key evidence in this case. Plaintiff amended its pleading and filed its First Amended Petition and Application for Temporary Restraining Order the following day.  Hearing was set for 9:00 AM on April 22. Shortly before midnight on April 21, McQueen removed the lawsuit to this Court pursuant to 28 U.S.C. §1441(a). *See* Notice of Removal [Dkt. 1] (attaching Plaintiff's original Petition, not its live pleading).

4.      Plaintiff now replaces its state-court pleadings with this Original Complaint, accompanied by motions requesting hearing and entrance of a temporary restraining order and a preliminary injunction, and associated expedited discovery.  Though this Complaint states claims against both McQueen and his new employer, this controversy is subject to a contractual arbitration requirement, and thus Plaintiff comes now before this Court seeking only emergency injunctive relief to restrain McQueen's ongoing contractual and statutory violations that threaten immediate, irreparable harm to Direct Biologics, and related discovery.[1]  Direct Biologics intends to seek further judicial consideration only to the extent arbitration does not fully resolve its claims.

---

[1] As explained herein, this controversy is subject to mandatory arbitration under Defendant McQueen's written Employment Agreement because it arises out of McQueen's former employment with Direct Biologics. *See* Employment Agreement § 14.  However, the Employment Agreement clarifies that Direct Biologics "may pursue a temporary restraining order and/or

## II.      PARTIES

5.      Plaintiff Direct Biologics is a Wyoming limited liability company with its principal place of business in Austin, Texas. Direct Biologics' headquarters are located at 1529 Barton Springs Rd, Suite 32 Austin, Texas 78704.

6.      Defendant Adam McQueen is an individual residing in Georgia. He can be served at his residence at 17 Wembley Dr. Dallas, GA 30157, or wherever else he may be found.

7.      The two Defendants comprising Vivex are incorporated in different states, but have identical principal offices and registered agents.

8.      Defendant Vivex Biologics Group, Inc. is a Delaware corporation with its principal place of business in Georgia, located at 3200 Windy Hill Rd SE, Suite 1650W, Atlanta, Georgia 30339. It can be served through its registered agent, Corporate Creations Network, Inc., 2985 Gordy Parkway, First Floor, Marietta, GA 30066.

9.      Defendant Vivex Biologics, Inc. is a Georgia corporation with its principal place of business in Georgia, located at 3200 Windy Hill Rd SE, Suite 1650W, Atlanta, Georgia 30339. It can be served through its registered agent, Corporate Creations Network, Inc., 2985 Gordy Parkway, First Floor, Marietta, GA 30066.

## III.     VENUE AND JURISDICTION

10.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a), because there is complete diversity of the parties and the amount in controversy exceeds $75,000.00. Plaintiff is a Wyoming company with its principal place of business in Texas, making it a citizen of Wyoming and Texas. Defendants are citizens only of Georgia and Delaware, as follows: (1)

---

preliminary injunctive relief in connection with any restrictive covenants, with related expedited discovery for the parties, in a court of law in state district court or federal court in Austin, Texas and, thereafter, require arbitration of all issues of final relief." *Id.*

McQueen is an individual domiciled in Georgia; (2) Defendant Vivex Biologics, Inc. is a Georgia corporation with its principal place of business in Georgia; and Defendant Vivex Biologics Group, Inc. is a Delaware corporation with its principal place of business in Georgia. Because Plaintiff's citizenship (Wyoming, Texas) does not overlap with any Defendants' citizenship (Georgia, Delaware), diversity is complete. Direct Biologics seeks injunctive relief and asserts the entitlement to monetary relief over $1,000,000.

11.     This Court has personal jurisdiction over Defendant McQueen under Texas' long-arm statutes because McQueen has purposely availed himself of the benefits of the State of Texas, and McQueen has sufficient contacts with Texas for this Court to exercise jurisdiction over him. As alleged below, McQueen worked for Direct Biologics, a company based in Travis County, for four years, repeatedly traveled to Austin the company's headquarters in Austin, and directed his employment activities and communications to Direct Biologics' headquarters. He routinely conducted business at Direct Biologics' Austin headquarters via telephone and video conferencing, including by calling in to weekly team meetings in which he received Confidential Information relevant to this dispute. This Complaint asserts claims for McQueen's breach of contracts he entered with his Texas-based employer, and McQueen also executed a notarized affidavit while located in Travis County that affirms the duties whose breach is alleged herein. McQueen's breaches of his contracts and his fiduciary duties have caused injury in the state of Texas, where his former employer Direct Biologics is headquartered.

12.     Vivex is subject to this Court's jurisdiction under Texas' long-arm statutes because it has purposely availed himself of the benefits of the State of has sufficient contacts with Texas for this Court to exercise jurisdiction over him. As alleged herein, Vivex is causing injury in Texas through its torts and statutory violations, including its deliberate interference with contractual

duties owed in Texas, under contracts that expressly provide for enforcement in Texas. Vivex is injuring a company headquartered in Texas through misappropriation and misuse of confidential information created and stored in Texas. Vivex also has purposefully availed itself of the benefits of Texas: it targets the Texas market with its products, and employs a Regional Sales Director in Texas.

13.     Jurisdiction and venue also lie in this Court by the parties' agreement, pursuant to the contracts at the heart of this dispute. Defendant McQueen and Plaintiff are parties to an Employment Agreement that expressly authorizes Direct Biologics to "pursue a temporary restraining order and/or preliminary injunctive relief in connection with any restrictive covenants, with related expedited discovery for the parties, in a court of law in state district court or federal court in Austin, Texas." Employment Agreement § 14.  Furthermore, when Defendant McQueen became a Member of Direct Biologics' LLC, he formally adopted and became a party to Direct Biologics' Operating Agreement, which provides that McQueen "hereby irrevocably consent[s] to the jurisdiction of any United States Federal Court sitting in Austin, Texas for purposes of any litigation among or between the Company . . . [and McQueen] concerning the Company or this Agreement. . . . . The parties hereto hereby individually agree that they shall not assert any claim that they are not subject to the jurisdiction of such court, that the venue is improper, that the forum is inconvenient or any similar objection, claim or arguments." As a signatory to these agreements, McQueen has expressly consented to this Court's jurisdiction and to the Western District of Texas as the proper venue for these proceedings.

14.     Though not a signatory to the above agreements, Vivex is subject to their forum selection clauses under the Fifth Circuit's doctrine of equitable estoppel because Direct Biologics' claims against Vivex rely on the terms of the company's written agreements with Defendant

McQueen, and Direct Biologics' claims allege that McQueen and Vivex engaged in substantially interdependent and concerted misconduct. *Monocoque Diversified Interests, LLC et al v USA Jeft Airlines, Inc*, No. A-21-CV-00956-RP, 2022 WL 292797, at *4 (W.D. Tex. Feb. 1, 2022).

15.     Venue also is proper in this forum under 28 U.S. Code § 1391(b)(2) because a substantial portion of the events and omissions giving rise to the claim occurred in the Western District of Texas, notably at Direct Biologics' Austin headquarters.

## IV.     FACTUAL BACKGROUND

### A.     Direct Biologics Has Established Itself as a Leader in the Emerging Biologics Regenerative Heath Solutions Market.

16.     Based in Austin, Texas, Direct Biologics is a trailblazing biotechnology company focused on cellular and regenerative therapies. Direct Biologics' scientific innovation, deep knowledge, and industry expertise have made it uniquely successful in bringing life-saving therapeutic biopharmaceutical products to market. Direct Biologics holds an extensive intellectual property portfolio surrounding bone marrow derived mesenchymal stem cells (MSCs), their signals, and their ability to treat multiple disease indications.

17.     One of Direct Biologics' product lines is based on AmnioWrap™ ("AmnioWrap"), a unique allographic skin substitute that creates an environment ideal for tissue repair and regeneration. AmnioWrap's innovative technology prevents moving/gliding, and its ability to wrap around irregularities and adhere to any surface renders it an ideal skin substitute for slow-healing wounds, with wide-ranging applications in ophthalmology, wound care, burn injury, and general surgery.

18.     A second Direct Biologics product line implements a proprietary extracellular vesicle ("EV") technology, perfected in 2018 by Plaintiff's trailblazing research team. In 2019, Direct Biologics launched the industry-leading product ExoFlo™ ("ExoFlo"), which combines

6

growth factors, regulatory proteins and EVs including exosomes. ExoFlo uses the body's own communication and signaling systems to stimulate targeted activation of natural healing processes to reduce inflammation and restore and maintain tissue health.

19.     ExoFlo shot onto the market as a vastly superior solution with numerous physiological applications. Initially operating under Section 361 of the Public Health Service (PHS) Act—which does not require a license or approval from the FDA—Direct Biologics' ExoFlo-based EV products were available nationwide and prescribed in a wide range of applications by treating medical providers, including the treatment of osteoporosis and hair loss.

20.     ExoFlo quickly established an industry-leading reputation, based both on its patented formulation and its innovative, proprietary manufacturing processes that produce a uniquely pure product with consistently high efficacy. Direct Biologics begins with source materials from established, confidential cell banks, and then uses secret processes and components to magnify the EV functionality and ensure a consistent, reliable bioactivity level. Each batch of ExoFlo is purified using an advanced, proprietary "certified good manufacturing practice" ("cGMP") that Direct Biologics developed and implemented in-house. Direct Biologics' pathbreaking team of research and development scientists continually refine its market-leading manufacturing and other patented technologies.

21.     In 2021, the EV market was transformed when the FDA announced that EV products would henceforth be regulated under Section 351 of the PHS as "drugs and biological products," and thus could not be marketed or sold in the United States without securing formal FDA approval to do so. The new FDA stance forced ExoFlo and all its competitors off the market, and fired the starting gun in a race among Direct Biologics and its competitors to secure the FDA approval required to bring (or return) their EV products to the market.

22.     Due to its stringent manufacturing protocols and superior formulation, ExoFlo was one of the few EV products poised to seek immediate regulatory approval. In fact, ExoFlo's FDA approval process was already underway, fast-tracked under the "Operation Warp Speed" initiative for drugs that combat COVID-19. Early in the COVID-19 pandemic, a team of doctors used "compassionate use" approval to explore whether ExoFlo could help treat COVID-associated acute respiratory distress syndrome (ARDS). ExoFlo produced dramatic, life-saving outcomes in severely ill patients admitted to intensive care units. These striking results prompted Direct Biologics to file an initial Investigational New Drug ("IND") application for "Exit COVID-19," a novel treatment utilizing ExoFlo.

23.     The FDA accepted and approved this application, and further, relied on those early use cases' remarkable data to approve this initial Exit COVID-19 IND's completion of regulatory Phase I, allowing it to proceed directly to Phase II clinical trials. Shortly thereafter, an independent U.S. biotech news listing in 2020 heralded Direct Biologics as the leader among EV and exosome-based companies. Direct Biologics has since submitted an additional six IND applications for ExoFlo-based treatments for various disease indications, all of which the FCA accepted and approved for clinical trials, which are proceeding.

24.     During 2021, Direct Biologics executed and successfully completed Phase II of Exit COVID-19, which established ExoFlo's safety and efficacy. Then, in March 2022, the company achieved two monumental milestones.

25.     First, on March 11, 2022, the FDA granted Direct Biologics a regenerative medicine advanced therapy designation ("RMAT") for ExoFlo's use to treat severe or critical COVID-19. By granting this designation, the FDA confirmed that ExoFlo's trials to date demonstrate its safety and efficacy, and affirmed that ExoFlow advances the known standard of

care for treating severe or critically ill COVID-19 patients, whose needs are now unmet. The FDA's RMAT designation also fast tracks Direct Biologics' ExoFlo-based Exit COVID-19 IND approval process through the FDA, irrespective of Operation Warp Speed. Fewer than 70 companies in the history of the FDA have obtained an RMAT grant.

26.     Second, on March 24, 2022, the FDA approved ExoFlo to enter Phase III clinical trials for Exit COVID-19, which is the final stage before Direct Biologics can submit its Biologics License Application ("BLA") to offer this treatment to the consumer market. If successful in Phase III, which primarily addresses appropriate dosing levels, ExoFlo will be the first purely biologics EV drug ever to receive FDA approval. This would make Direct Biologics the *only* company authorized to commercialize and sell a purely biologics EV drug in the United States.

27.     In sum, Direct Biologics is an industry leader in accelerated biologics drug development. Though its scientific and manufacturing innovation is at the heart of Direct Biologics' success, Direct Biologics also is uniquely situated in the regenerative medicine space because of its deep knowledge and experience in shepherding new therapies through the testing and FDA approval stages. Bringing therapies from the bench to market is a costly and time-consuming process, with many companies stalled in preclinical or early-stage drug development. Direct Biologics derives significant competitive advantage from its strategies and protocols, painstakingly learned from experience, that have positioned it at the head of the field in the race to bring potentially life-saving EV medical treatments to an emerging market.

**B.     McQueen Becomes One of Direct Biologics' First Employees and an Equity Member, and Executes Multiple Contracts Imposing Restrictive Covenants.**

28.     For the past four years, Defendant Adam McQueen has had a front-row seat as Direct Biologics has developed its innovative technologies, refined its manufacturing and logistics systems, contracted several key contract manufacturing organizations ("CMOs"), and navigated

the FDA approval process at an extraordinary pace. As the company's third-hired employee, an equity-holding Member of the LLC, and until just recently a member of its C-level strategy and operations teams, McQueen knows all Direct Biologics' secrets. He is one of the only people in the company to have been intimately involved with both the AmnioWrap and EV product lines, and he is one of handful of individuals who knows the company's most closely guarded secret: the formula and production specifications for its flagship technology, ExoFlo.

29.     At least four times in the past four years, McQueen has signed agreements memorializing his obligations and duties to Direct Biologics, including promises not to compete with Direct Biologics, not to solicit its customers or employees, and to protect its proprietary and confidential information.

30.     McQueen signed the first of these agreements, his initial Employment Agreement, on April 30, 2018, when he was hired just half a year after Direct Biologics was founded, as the startup company's third employee. On October 27, 2021, McQueen and Direct Biologics executed an Amended Employment Agreement (hereinafter "Employment Agreement"), which superseded and replaced the 2018 Agreement. The Amended Employment Agreement confirms McQueen's position and contains a covenant not to compete, terms protecting the company's Confidential Information, and other relevant provisions, discussed in detail below.

31.     McQueen also was admitted as a Member of the Direct Biologics LLC effective March 1, 2018, with 1,100,000 units of membership equity, when he executed a Joinder Agreement to the company's Operating Agreement ("Joinder Agreement") on February 15, 2021. By signing the Joinder Agreement, McQueen expressly adopted and became a party to the company's original Operating Agreement (executed September 12, 2017, by Direct Biologics' original Members) in effect at that time, as well as the subsequent duly adopted and ratified Second Amended and

Restated Operating Agreement of Direct Biologics, LLC effective May 10, 2021 (hereinafter "Operating Agreement"). The original and the amended Operating Agreement both contain identical covenants restricting Members from accepting employment with a Direct Biologics competitor, soliciting Direct Biologics' customers or employees, and using or and disseminating Direct Biologics' Confidential Information ("CI"), which are discussed in further detail below.

32.     Notably, the one-page Joinder Agreement specifically confirms that McQueen acknowledges and agrees to be bound by the Operating Agreements' covenants in Section XVIII, which include covenants restricting Members from competing with the company, soliciting its customers or employees, and maintaining possession of, using, or disseminating its Confidential Information. McQueen also is subject to other agreements with Direct Biologics that impose similar obligations to protect and refrain from disseminating or misappropriating Direct Biologics' Confidential Information.

33.     Finally, on January 21, 2022, McQueen executing an affidavit before a Travis County Notary Public, while physically located in Austin, reiterating his duties to protect Direct Biologics' Confidential Information, swearing that was and had been fully compliant with them, and confirming that he understood the ramifications should he breach those duties.

   C.     **McQueen's Position Gave Him Access to Direct Biologics' Confidential and Proprietary Information.**

34.     As one of Direct Biologics' first employees, McQueen has had unfettered access to crucial information throughout the development of Direct Biologics' flagship ExoFlo technology and, critically, its scientific process, strategies, and methods for accelerating regulatory approval, including the FDA process that now poses a barrier to entry for competitors in the EV marketplace. McQueen thus possesses secret Direct Biologics information that would enable a competitor like

Vivex to replicate Direct Biologics' model and success without investing the money and time Plaintiff necessarily expended to develop this knowledge independently.

35.     Because of his unique position, McQueen was involved in senior level meetings discussing all aspects of both the AmnioWrap and ExoFlo product lines, ranging from the tiniest manufacturing details to its broad market strategies, and everything in between. During the past four years, McQueen observed as Direct Biologics discovered competitively advantageous implementation refinements as broad as the identities of the best vendors for the many necessary EV product components and as specific as the best choice for bottle stoppers.  During his time at Direct Biologics, McQueen served as the Executive Vice President for Marketing, Regulatory, Clinical and Medical Education with responsibilities for product strategies, pricing, marketing, sales and client development, operations, production and manufacturing, regulatory, compliance and clinical aspects of the business. He also was assigned to help prepare Direct Biologics' initial IND submission to the FDA, for the ExoFlo-based Exit COVID-19, which gave him access to every detail of the product manufacturing, clinical testing protocol, and plan for FDA approval. His final role at Direct Biologics included spearheading the initiative to bring AmnioWrap to market and marketing this product to customers throughout the United States, making him one of the only employees intimately familiar with all of Direct Biologics' product lines. He also took part in the strategy sessions and drafting for Direct Biologics' confidential materials to present to potential new investors.

36.     McQueen was a member of the company's Intellectual Property Steering Committee, and thus was invited to and attended the Direct Biologics Intellectual Property Summit in Las Vegas in September 2020. At the Summit, McQueen attended presentations from high-level employees and Direct Biologics' outside intellectual property lawyer that revealed sensitive details

of the company's research and business strategies, including the details of all Direct Biologics' current trade secrets, patents and planned patent filings, its legal and regulatory strategy, specific plans for testing at various investigational review board studies and clinical trials for different ExoFlo lines, and the new EV product lines it is pursuing. Indeed, McQueen was so intimately familiar with Direct Biologics' trade secrets that he himself presented at this conference.

37.     McQueen's job duties further included sales, marketing, manufacturing and media management, and he regularly attended the weekly R&D and Manufacturing calls that addressed the company's entire manufacturing and distribution operation in granular detail, and illuminated its broader product development strategy. The calls discussed information critical to Direct Biologics' operations, such as its vendors and facilities—including those for cell banking—its product manufacturing, lyophilization, product storage and shipping, packaging, labeling, printing, quality control, and more. Direct Biologics' confidential source materials and unique manufacturing process are at the core of its competitive advantage. Direct Biologics begins with source materials from cell banks and then uses a secret process—namely, a proprietary "certified good manufacturing practice" ("cGMP") that Direct Biologics developed and implemented in-house—to magnify the EV functionality and ensure a consistent, reliable bioactivity level. McQueen has detailed knowledge of this cGMP process, which provides a competitive edge to Direct Biologics and makes its ExoFlo product unique in the marketplace. Similarly, during these calls McQueen learned the details of Direct Biologics' proprietary lyophilization process, by which it transforms ExoFlo into a nano-powder that, when re-constituted in a saline solution, is shelf stable at room temperature. The lyophilization process is another trade secret that differentiates Direct Biologics' products from other EV products, which need to be refrigerated. Discovering McQueen's knowledge of these and other innovative manufacturing secrets, as well as Direct

Biologics exact source materials, formulae, and vendors, would afford a competitor like Vivex an unfair advantage over Direct Biologics, who developed its processes over years of trial and error.

38.    During the time McQueen attended these meetings, Direct Biologics' efforts culminated in the successful completion of a Phase II trial that confirmed ExoFlo's safety and efficacy to treat various conditions, and the launch of a Phase III clinical trial for Exit COVID-19, the final phase prior to drug application and approval. This milestone is significant: the majority of new therapies submitted for FDA approval never make it *to* Phase II, much less successfully complete it. Direct Biologics is the *only* company the FDA has ever approved to enter Phase III for a purely biologic EV drug. Upon completion of Phase III clinical trials, Direct Biologics will be able to seek a BLA license and become an approved biologics drug, meaning ExoFlo is poised to be the first biologics EV drug to ever receive FDA approval for commercial use in the United States, and the first entrant into the EV drug commercial marketplace.

39.    When ExoFlo reached the Phase III milestone for Exit COVID-19, McQueen knew he had been privy to every detail of Direct Biologics' successful effort to fast-track an EV treatment from the starting block to the brink of the finish line, empowering him to bestow an extraordinary, unearned advantage on a competitor like Vivex that seeks to undercut Direct Biologics' market advantage. Indeed, McQueen carries with him knowledge possessed by only a handful of people anywhere: all the information Vivex needs to exactly replicate Direct Biologics' flagship product.

40.    Direct Biologics received ExoFlo's Phase III FDA approval on Thursday, March 24, 2022. The following Monday, March 28, 2022 (just four days later), McQueen tendered his resignation. By week's end, he was already working as a senior Vivex employee, in direct breach of his contractual covenants. As explained below, Vivex already competes with Direct Biologics,

both with Direct Biologics' key revenue-generating AmnioWrap product line and in the emerging EV field.  Vivex is one of only a few companies that has the resources, infrastructure, and commercial motive in place to immediately and wrongfully exploit the Direct Biologics Confidential Information McQueen is carrying with him to his new employer.

**D.      McQueen Was and Is Contractually Bound by Covenants Barring Him from Working for Vivex and from Using or Disclosing Direct Biologics' Confidential Information.**

41.      Both McQueen's Employment Agreement and the Direct Biologics Operating Agreement contain valid and enforceable Covenants barring McQueen from (i) competing with Direct Biologics, (ii) soliciting its employees or customers, and (iii) retaining, misusing, or disseminating its Confidential Information, for the duration of his employment or Membership and defined periods thereafter. As noted above, McQueen executed the Amended Employment Agreement in 2021 as a condition of his continued employment, and agreed to be bound by the Operating Agreement that same year when he was granted 1,100,000 Units in the LLC and admitted as a Member.

*1.   McQueen Agreed Not to Compete with Direct Biologics for at Least One Year Post-Termination.*

42.      McQueen's Employment Agreement provides in relevant part:

[McQueen] shall not, during employment and for a period of **one year following termination**, own or **provide services as an employee** or contractor similar to that which [McQueen] provided to [Direct Biologics], to any **entity that competes** with [Direct Biologics'] Business of . . . developing, producing, manufacturing, providing, soliciting orders for, selling, distributing, or marketing . . . in any state of the United States of America in which [Direct Biologics] does business, . . . **any regenerative medical products** that (i) [Direct Biologics] currently anticipates developing, producing, providing, marketing, distributing or selling, (ii) [Direct Biologics] develops, produces, provides, markets or distributes [during McQueen's employment], or (iii) are in development before or when [McQueen's] employment terminates and about which [McQueen] received trade secret or Confidential Information.

Employment Agreement at ¶ 6.1 ("Covenant Not to Compete") (emphasis added).

43.    The Operating Agreement imposes slightly broader, overlapping restrictions:

> [S]o long as [McQueen] remains as a Member of the Company, and for **twenty-four (24) months** upon the transfer or disposal of all of [his] Units . . . [McQueen] shall not directly or indirectly own an interest in or engage in (whether as an **employee**, principal, shareholder, partner, consultant or any other capacity) an enterprise conducting **business activities that are the same or substantially similar to** those of the Company anywhere in the United States of America or territories thereof (the "Territory"). [McQueen] agree[s] that the broad interpretation of this restriction Is necessary in light of the potentially broad application of [Direct Biologics'] Technology . . . and in order to protect the Company's interests.

Operating Agreement § 17.1(b) ("Restrictions on Competition") (emphasis added).

### 2. *McQueen Agreed Not to Solicit Direct Biologics' Employees for at Least One Year after Termination.*

44.    As to solicitation of Direct Biologics' employees, McQueen's Employment Agreement provides, in relevant part:

> [McQueen] shall not, during employment or for a period of one year following termination of employment with [Direct Biologics], directly or indirectly solicit, hire, induce, recruit, or encourage any officer, director, employee, independent contractor, or consultant of [Direct Biologics], who was employed by or affiliated with [Direct Biologics] at the time of [McQueen]'s termination, to leave [Direct Biologics] or terminate his or her employment or relationship with [Direct Biologics].

Employment Agreement § 6.3 ("Non-Solicitation of Employees").

45.    The Operating Agreement again imposes a similar prohibition in effect during his Membership and for three years thereafter, barring McQueen from "either directly or indirectly . . . in any way, solicit[ing] or hir[ing] for employment or for engagement as an independent contractor in a business that is competitive with the business of [Direct Biologics]" any Direct Biologics employee or independent contractor working for Direct Biologics at the time of or in the twelve months prior to the solicitation. Operating Agreement § 17.1(d) ("Solicitation for Employment").

3. *McQueen Agreed to Protect and Return Direct Biologics' Confidential Information and Trade Secrets.*

46.     In exchange for Direct Biologics agreeing to "provide [McQueen] with Confidential Information in the course of [his] employment." McQueen promised that he:

> during employment and at all times thereafter, will hold the Confidential Information in strict confidence and will not use, reproduce, disclose or deliver, directly or indirectly, any Confidential Information except to the extent necessary to perform [his] duties as an employee of [Direct Biologics] or as permitted by a duly authorized representative of [Direct Biologics]. [McQueen] will use best efforts to prevent the unauthorized use, reproduction, disclosure, or delivery of Confidential Information by others.

Employment Agreement § 5.4 ("Restrictions on Confidential Information"). The Employment Agreement provides a comprehensive definition of "Confidential Information," specifically including, but not limited to, Direct Biologics':

- Research and development materials, including without limitation, information relating to clinical trials, patents or patent applications, trade secrets, Direct Biologics' products including those in development, biological materials used or considered by Direct Biologics, pre-clinical research, clinical research, experimental work, technical or engineering know-how, . . . processes, formulas, algorithms, methods, techniques, works in process, systems, technologies, disclosures, applications and other materials;

- financial information and materials, including, without limitation, information and materials relating to costs, vendors, suppliers, licensors, profits, markets, sales, distributors, joint venture partners, customers, subscribers, members and bids, whether existing or potential;

- business and marketing information and materials, including, without limitation, information and materials relating to future development and new product concepts;

- personnel files and information about compensation, benefits and other terms of employment of the Employer's other employees and independent contractors; and

- any other information or materials relating to the past, present, planned or foreseeable business, products, developments, technology or activities of [Direct Biologics].

47.     Similarly, in the Operating Agreement, McQueen agreed to detailed provisions protecting Direct Biologics' Confidential Information and Trade Secrets, including promising (i)

not to "divulge, furnish, make available or disclose any Confidential Information in any manner,

to [anyone], except with respect to business of the Company" and pursuant to a Board-approved

Confidentiality Agreement; and (ii) not to "use any Confidential Information for [himself] or for

any other Person except as may be necessary in connection with the performance of [his] duties"

as a Member. *See* Operating Agreement § 17.1(a). The Operating Agreement defines Confidential

Information as:

> all information used in or relating to the Intellectual Property or the business of the
> Company which is not generally known to the competitors of the Company,
> whether or not a trade secret as defined under applicable law, and which gives an
> advantage to the Company, including, without limitation, its patents, know-how,
> show-how, and other intellectual property, its development plans, designs,
> specifications, flow charts, processes, formulas, data, all such information relating
> to the identity of the potential and actual customers of the Company, their
> respective methods of operation, financial data and pricing policies.

*Id.*

48.     At various points in the past four years, McQueen has executed additional

agreements with similar terms protecting Direct Biologics' Confidential Information.

### 4. *McQueen Also Owed Direct Biologics a Contractual Duty of Loyalty.*

49.     Finally, McQueen's Employment Agreement confirmed that, as an employee of

Direct Biologics, he owed the company a duty of loyalty, to:

> (a) expend [his] best efforts on behalf of [Direct Biologics] and abide by all policies
> and decisions made by [Direct Biologics] . . . and (b) act in the best interest of
> [Direct Biologics]. During employment, [McQueen] will not, without [Direct
> Biologics'] express written consent, engage in any employment or business activity
> (paid or unpaid) other than for [Direct Biologics], including but not limited to
> employment or business activity that is competitive with, or would otherwise
> conflict with or distract from employment by [Direct Biologics]. While employed
> by [Direct Biologics], [McQueen] will not undertake any planning for any outside
> business activity competitive with [Direct Biologics]. [McQueen] agrees not to
> refer any client or potential client of [Direct Biologics] to competitors of [Direct
> Biologics], without obtaining [Direct Biologics'] prior written consent, during
> [McQueen's] employment.

Employment Agreement § 3.2.

50.     McQueen's job description in the same Employment Agreement reiterated that McQueen confirmed that he would:

> perform faithfully and diligently all duties assigned to [him, and] . . . devote his full business time and attention to the performance of his duties hereunder and will not engage in any other business, profession, or occupation for compensation or otherwise which would conflict or interfere with the performance of such services, either directly or indirectly, without the prior written consent of the President or Chief Executive Officer of the Company.

> 5.  *McQueen Repeatedly Acknowledged and Affirmed His Obligations Under the Restrictive Covenants.*

51.     As noted above, McQueen has executed documents imposing and reiterating his agreements not to compete, solicit, and/or or misappropriate Direct Biologics' Confidential Information at least four times in the four years since he joined Direct Biologics. He entered binding contracts when he became a Direct Biologics employee in 2018, when his Employment Agreement was revised in 2021, and when he was admitted as a Member in 2021, as well as at various other times in his tenure at Direct Biologics.

52.     McQueen also expressly confirmed his understanding of and compliance with his confidentiality covenants in an affidavit he executed on January 21, 2022, which reiterated his obligations to his employer, swore that was and had been fully compliant with them, and confirmed that he understood the ramifications should he breach those duties. Significantly, in this affidavit executed just three months ago, McQueen stated under oath:

> I further swear and affirm that (i) I am not personally in possession, custody, or control of the Company's Confidential Information or Trade Secrets, whether original or copies of same, and (ii) that my access to the Company's Confidential Information or Trade Secrets, whether original or copies of same, is only through the Company's authorized and registered information resources. . . .

53.     As explained herein, this sworn representation was false. Direct Biologics discovered, after it terminated McQueen's employment, that McQueen possesses a longstanding personal online storage account into which he had been saving Direct Biologics' trade secret and

confidential information.  McQueen kept these documents and accessed them after he left Direct Biologics and went to work for its competitor.

     **E.**     **McQueen Was Undermining Direct Biologics Even While Still Employed.**

     54.     Though McQueen was one of its first hires and Direct Biologics aimed to make him one of its senior leaders, McQueen ultimately proved to be not a managerial asset but a significant liability. In his various roles at the startup company, McQueen was given instrumental roles both in bringing ExoFlo to market and spearheading the launch and establishment of AmnioWrap as a core profit center. But McQueen's direct reports repeatedly complained of his lack of leadership and work ethic, and one key manager even noted in her exit interview that she was resigning because she would rather leave the company than continue to work for and report to McQueen. Direct Biologics also had to remind McQueen on multiple occasions that he was not to disclose his prior employer's confidential information to Direct Biologics.

     55.     By late 2021, management began to have concerns about McQueen's commitment to the company's success, and became concerned that he might be deliberately working against the company or siphoning its knowledge to aid another endeavor. On information and belief, no later than the fall of 2021, McQueen engaged in discussions with a former Direct Biologics employee about marketing competing products on behalf of a competitor and/or starting a competing business. When management confronted McQueen with reports it had received about his activities from industry contacts outside the company, he denied everything. Though Direct Biologics did not have enough information to take decisive action at that time, as a precaution, management asked McQueen to reaffirm *in writing* that he understood and was in compliance with his contractual obligations to protect Direct Biologics' trade secrets and confidential information. McQueen agreed and executed an affidavit to this effect in January 2022.

56.     But rather than improving, McQueen's attitude and commitment to the company deteriorated even further. In the months that followed, McQueen became increasingly insubordinate and repeatedly ignored and refused express directives from senior executives. For example, McQueen was responsible for ensuring that Direct Biologics placed a critical production-related order each quarter with one of its key suppliers. When Direct Biologics discovered that the necessary order had not been placed for Q1 of 2022, its senior management held a call in which the company President expressly directed McQueen to place the order. Only after McQueen was finally terminated at the end of March did Direct Biologics discover that McQueen *still* had never placed the order—and thus put an important vendor contract at risk.

57.     McQueen also put several Direct Biologics business relationships at risk. For instance, McQueen was expressly told by a Direct Biologics consultant and key contracted manufacturer that he needed to register Direct Biologics' average sales price for AmnioWrap with the manufacturer. McQueen ignored the specific request.  His failure to provide the requested price information compromised Direct Biologics' relationship with the manufacturer. Separately, after McQueen failed to nurture critical relationships with a certain key reseller, sales consultant, and various customers, Direct Biologics' President specifically instructed McQueen to reinforce the relationships by visiting the relevant individuals in person. McQueen ignored him, and Direct Biologics subsequently lost four key partnerships. By the time other personnel were able to step in and mitigate the fallout from McQueen's failures, it was too late to salvage some of these relationships—including, critically, a relationship that Direct Biologics had expected to play a central role in launching ExoFlo to market once the FDA regulatory process is completed.

58.     McQueen also was directly instructed to prepare marketing materials and videos to help launch the AmnioWrap product line, but failed to take any action to complete these critical

tasks. He also failed to submit the necessary formal registration of a new Direct Biologics tissue facility when specifically asked and required to do so.  He also neglected to register process for AmnioWrap with the Center for Medicare Services as directed. In early 2022, Direct Biologics' President met with McQueen at the company headquarters in Austin and told McQueen his job was at risk if McQueen failed to successfully turn around his past projects and prepare for and coordinate Direct Biologics' hosting of a conference to promote the AmnioWrap product line in late April. McQueen failed to take any of the necessary steps either to make the conference happen or to rectify his past failures. McQueen's dereliction of his assigned duties ultimately forced Direct Biologics to delay the planned AmnioWrap event.

59.     McQueen's patent insubordination with its tangible negative consequences for Direct Biologics was the last straw, and near the end of March 2022, management decided to terminate him.

**F.     McQueen Is Fired for Cause, and Immediately Starts Working for a Direct Competitor.**

60.     On information and belief, by March 28, 2022, McQueen knew or suspected that he was about to be terminated for cause. Two business days earlier, Direct Biologics had received the FDA's Phase III entry approval letter, and thus McQueen knew he had seen ExoFlo's development process from inception to the brink of success. Now possessing all the Direct Biologics information Vivex would need to expedite its competing EV venture, McQueen preemptively tendered his resignation on Monday, March 28, 2022, at approximately 5:30 PM local time.

61.     The next day, notwithstanding his purported resignation, McQueen still called in and attempted to attend the weekly Marketing and R&D teleconference. McQueen's presence was detected by one of Direct Biologics' senior staff, who took swift action to eject him from the call.

62.     Later that day, March 29, Direct Biologics formally terminated McQueen's employment for cause, in a letter that rejected his attempted resignation. The letter specified that McQueen was being terminated due to his:

> (i) conduct that materially and adversely affects the Company's operations; and

> (ii) breaches of the restrictive covenants set forth in the Employment Agreement and . . . Operating Agreement.

63.     McQueen's termination letter specifically reminded him of his contractual non-compete, non-solicit, and confidentiality obligations, and demanded return of any property, documents, or materials in his possession, including the company's Confidential Information.

64.     Just days after his termination, management discovered that McQueen was already employed as a senior executive with Direct Biologics' direct competitor, Defendant Vivex.

**G.     McQueen Was Secretly Saving Its Confidential and Proprietary Information to His Personal Cloud-Based Accounts, Which He Maintained After Leaving.**

65.     After McQueen began work at Vivex, Direct Biologics discovered that McQueen possesses and controls a cloud-based storage account into which he had been saving Direct Biologics' highly sensitive and secret documents.

66.     While employed by Direct Biologics and subject to contractual obligations barring these actions, McQueen linked his personal Dropbox account to Direct Biologics' online accounts. Using this Dropbox link, McQueen deliberately misappropriated to his personal control numerous documents containing Direct Biologics' Confidential Information and trade secrets, including some of the company's most sensitive proprietary information. For example, as of April 14, 2022, more than two weeks after his employment ended, McQueen had in his possession, among other items:

> a.   A folder named "Direct Biologics/Patent Portfolio Information," which contains a Direct Biologics PowerPoint document entitled "Patent Portfolio and Strategy."

     b.   A folder named "Direct Biologics Sales Folder/Order Forms and Pricing," which contains, among other things, the "2021 Price List" for one of Direct Biologics' products. This document is clearly labeled "Confidential."

     c.   A folder named "Direct Biologics Sales Folder/Medical Information Request," which contains a document entitled "Medical Information Request Training" that is clearly labeled "Company Confidential."

     d.   A folder named "Competitive Market" containing a Direct Biologics Excel spreadsheet entitled "Product and Manufacturer Matrix."

     e.   A folder containing draft documents detailing Direct Biologics' confidential and proprietary protocols for conducting clinical evaluations.

67.    Direct Biologics never authorized McQueen to link his personal Dropbox account to its cloud-based corporate accounts, or to place company documents or information on his personal cloud storage account. Indeed, the presence of Direct Biologics' documents in McQueen's personal cloud storage system violates Direct Biologics' expressly stated company policy, as well as the terms of multiple contracts McQueen has executed with Direct Biologics. And on January 21, 2022, McQueen executed a sworn affidavit affirming that he did not personally possess or control any of Direct Biologics' Confidential Information or trade secrets, and that his access to any such material was "only through the Company's authorized and registered information resources."

68.    Direct Biologics did not discover McQueen's secret document cache until after his employment ended.

69.    On information and belief, McQueen has shared the Direct Biologics files he retained, including on his personal cloud storage account, with third parties, including Vivex.

24

70. On information and belief, McQueen maintains in his possession copies of the files he deleted from his cloud storage and/or other documents containing Direct Biologics Confidential Information and trade secrets.

71. On information and belief, Vivex now possesses Direct Biologics' Confidential Information and trade secrets, which it received from McQueen knowing that he had misappropriated them.

**H.    McQueen Is Currently Working in a Senior Position for a Direct Competitor.**

72. Defendant Vivex, McQueen's new employer, directly competes with Direct Biologics. As noted above, Direct Biologics has two core product lines: its EV technology platform, and AmnioWrap, an amnion allograft solution appropriate for multiple applications in the treatment of acute and chronic wounds. AmnioWrap is marketed to customers throughout the United States and provides an important source of revenue for the company.

73. Vivex directly competes with Direct Biologics in both spaces. Vivex's competition with AmnioWrap is plain from its internet homepage, where Vivex boasts of being "[t]he regenerative medicine company that develops and delivers innovative allograft solutions." https://vivex.com/ (last visited April 15, 2022). A bright green banner across the top of Vivex's home page declares: "VIVEX is expanding our Amnion & Wound Care Distribution Network." Vivex is targeting a nationwide market with its amnion allograft products, and McQueen is now providing Vivex with many of the same services he formerly provided in his role at Direct Biologics.

74. Furthermore, Vivex and McQueen appear to have tailor-made his new role to help Vivex exploit the misappropriated trade secret and Confidential Information about Direct Biologics' EV product line. Vivex competes alongside Direct Biologics in a niche scientific field,

and the emerging EV market is a plum opportunity that Vivex has been pursuing.[2] McQueen has intimate knowledge of key technologies and processes developed by Direct Biologics that Vivex could easily exploit. For example, McQueen has direct and specific knowledge of Direct Biologics' lyophilization process—a critical process for transforming ExFlow into a nano-powder format that can be re-constituted in a saline solution for shelf-stable storage at room temperature. Understanding this proprietary and confidential technology would afford Vivex an unfair advantage over Plaintiff as it races to bring new EV products to market.

75.     In sum, as a senior manager at Vivex, McQueen is now ideally positioned to help Vivex compete with Direct Biologics' key revenue-generating AmnioWrap product line, and guide Vivex through accelerated development and FDA approval of new EV products, using his intimate knowledge of precisely what has succeeded, and failed, for Direct Biologics in the past four years—including numerous documents McQueen misappropriated during his Direct Biologics tenure. The potential harm to Direct Biologics cannot be overstated: McQueen has walked through Vivex's door carrying Direct Biologics' blueprint of how to develop and move an EV product from concept to distribution network at top speed. McQueen's employment at Vivex, and his continued possession, disclosure, and misuse of Direct Biologics' confidential information, threatens to let Vivex destroy Direct Biologics' hard-earned competitive advantage.

---

[2] In the past, top Vivex employees have attempted to recruit key Direct Biologics executives and members of its research and development team, particularly those focused on EV products. Notably, as McQueen was leaving Direct Biologics, he stated in his exit interview that he wanted to move to a new company so he could work more extensively in the EV space. This detail is particularly significant because Vivex already employs several of the very small number of stem cell biologists who have the expert knowledge of EV science required to effectively exploit the detailed Confidential Information about Direct Biologics' ExoFlo and other EV technology that McQueen carries with him.

**I.      McQueen's Contracts Provide for Enforcement of the Covenants through Injunctive Relief, Including Issuance of a Temporary Restraining Order.**

76.      In McQueen's various contracts with Direct Biologics, the parties agreed that the above-described Covenants, including their time, scope, and geographic restrictions, are reasonable and necessary to protect the goodwill, Confidential Information and legitimate business interests of the Company, and that damages cannot adequately compensate Direct Biologics should McQueen breach his obligations. *See, e.g.,* Operating Agreement § 17.1(h), 17.4; Employment Agreement § 7. Accordingly, the parties' Agreements expressly permit Direct Biologics to seek a TRO and preliminary injunction to enforce McQueen's contractual obligations. *See, e.g.,* Employment Agreement § 14.

77.      As noted above, this controversy is subject to mandatory arbitration under Defendant McQueen's written Employment Agreement, which provides in relevant part:

> Any controversy or claim arising out of or relating to this Agreement or any matter arising out of the employment relationship between Employee and Employer or the termination of such relationship shall be resolved exclusively by arbitration to take place in Austin, Texas, under the authority of the Federal Arbitration Act, according to the rules of the then-current Employment Arbitration Rules of the American Arbitration Association ("AAA"), and judgment on the award rendered by the arbitrator may be entered by any court having jurisdiction thereof in Austin, Texas.
>
> However, a party may pursue a temporary restraining order and/or preliminary injunctive relief in connection with any restrictive covenants, with related expedited discovery for the parties, in a court of law in state district court or federal court in Austin, Texas and, thereafter, require arbitration of all issues of final relief.

Employment Agreement § 14.

78.      Pursuant to the Employment Agreement's requirement, Direct Biologics intends to pursue arbitration of its claims against all Defendants.[3] But because the circumstances described

---

[3] Though Vivex is not a signatory to the Employment Agreement, Direct Biologics' claims against Vivex are arbitrable in conjunction with its claims against McQueen, including because all of these claims are factually and legally intertwined, Direct Biologics' claims against Vivex rely on the

herein threaten imminent and irreparable harm, Direct Biologics comes before this court—as expressly authorized by the Employment Agreement—for the limited purpose of seeking "a temporary restraining order [and] preliminary injunctive relief in connection with any restrictive covenants, with related expedited discovery for the parties" before it seeks "arbitration of all issues of final relief." *Id.* Direct Biologics intends to seek further judicial consideration only to the extent arbitration does not fully resolve its claims.

### J.   In Response to this Lawsuit, McQueen Is Brazenly Spoliating Key Evidence of His Wrongdoing.

79.   After filing its Original Petition in state court on April 20, 2022, Direct Biologics discovered that McQueen (a) maintains a personal Dropbox online storage account into which he had saved files containing Direct Biologics' Confidential Information and trade secrets; and (b) that immediately after Direct Biologics informed McQueen that it was contemplating this lawsuit, and again immediately after it notified him that this suit had been filed, McQueen deliberately deleted various of those files in breach of his duties to preserve evidence in this litigation.

80.   On information and belief, McQueen's personal Dropbox account still contains Direct Biologics' Confidential Information and trade secrets, over which he has exclusive control and possession in violation of his contractual duties and trade secret laws, and that he has attempted to cover up his misappropriation of this and other information.

### V.   CAUSES OF ACTION

### Count 1: Breach of Contract – Non-Compete
#### (Defendant McQueen)

81.   Direct Biologics repeats and re-alleges the foregoing allegations as if fully set forth herein.

---

terms of the Employment Agreement, and Vivex engaged in concerted misconduct with McQueen to violate the terms of the Employment Agreement.

82.     To establish a breach of contract, Direct Biologics must show (i) a valid contract; (ii) Direct Biologics performed or tendered performance; (iii) the defendant breached the contract; and (4) Direct Biologics was damaged as a result of the breach.

83.     The non-compete covenants were ancillary to or part of otherwise enforceable agreements and supported by valid consideration.

84.     Direct Biologics performed all of its obligations pursuant to the Employment and Operations Agreements.

85.     Pursuant to the Employment Agreement, "[McQueen] shall not, during employment and for a period of one year following termination, own or provide services as an employee or contractor similar to that which [McQueen] provided to [Direct Biologics], to any entity that competes . . . in any state of the United States of America. Direct Biologics has performed each of its material obligations under the Agreement. Employment Agreement at § 6.1 ("Covenant Not to Compete"). The Operating Agreement also restricts his ability to compete. Under this contract, McQueen is prohibited from competing "so long as [McQueen] remains as a Member and for twenty-four (24) months upon the transfer or disposal of all of [his] Units." Operating Agreement § 17.1(b) ("Restrictions on Competition").

86.     McQueen employment was terminated on March 29, 2022. He is still a Member of Direct Biologics.

87.     McQueen breached his independent contractual obligations not to compete, when just a few days after his termination for cause, he joined Defendant Vivex, a direct competitor.

88.     McQueen's employment at Vivex in violation of his contractual non-competition covenants threatens to cause Direct Biologics imminent and irreparable harm.

89.     As a result of McQueen's contractual breaches, Direct Biologics also has suffered damages for which it is entitled to monetary relief in an amount to be established in arbitration, including but not limited to damages for loss of business, future loss of business, the loss of the expectancy value of the assets, and disclosure of Direct Biologics' competitively sensitive information, all in an amount to be established in arbitration.

### Count 2: Defend Trade Secrets Act ("DTSA")
### 18 U.S.C. § 1836 *et seq.*
#### (All Defendants)

90.     Direct Biologics repeats and re-alleges the foregoing allegations as if fully set forth herein.

91.     Plaintiff and Defendants are engaged in interstate commerce in the development, marketing, and sales of their regenerative medicine products.

92.     Direct Biologics' confidential and proprietary information includes (but is not limited to) the following: formulation for its products, product development strategy, regulatory strategy (including details of plans for testing at various phases and planned patent filings), details regarding its manufacturing processes, pricing of various components, list of approved vendors and facilities used for cell banking, lyophilization, product storage, and shipping, manufacturers, and identity of key contacts at the FDA and clinical trial hospitals.

93.     Each category of proprietary and confidential information is a trade secret within the meaning of 18 U.S.C. § 1839(3).

94.     Direct Biologics derives economic value and competitive advantage from this information not being known or used by its competitors or others.

95.     Direct Biologics has taken appropriate steps to ensure the confidentiality of this information, including state-of-the art information-security measures, such as password protection

and limitations on access to this information; company policies restricting its use and handling; physical restrictions on access to Direct Biologics' offices; technological restrictions on how employees may access this information; and non-disclosure and other agreements with its employees, Members, and others, including with McQueen.

96.     Defendants have misappropriated Direct Biologics trade secrets in violation of the Defend Trade Secrets Act, 18 U.S.C. § 1836 *et seq.*, as described herein.

97.     McQueen has forwarded and saved information on personal and/or other unauthorized devices and accessed Direct Biologics' systems after his termination for cause. McQueen has been sending trade secret information made available to him during his employment from his work computer to his personal accounts. This highly confidential information includes, but is not limited to, e.g., investor presentations, details about Direct Biologics' current and planned intellectual property portfolio, pricing lists, details about its proprietary protocols for conducting clinical evaluations, etc. – all of which information Direct Biologics shares only with limited audiences subject to contractual non-disclosure agreements.

98.     On information and belief, McQueen still possesses Direct Biologics' trade secret information in his personal Dropbox account, under his exclusive control, and also maintained this and other proprietary and confidential information on his computer hard drive, his personal devices and/or has maintained hard copies of documents in his home.

99.     McQueen also had access to product formulations—information only known to a handful of key employees like the exact formulation for ExFlo. McQueen also regularly participated in key C-suite level meetings, including the weekly team manufacturing and R&D teleconference, and the in-person Intellectual Property Summit of September 2020, at which high level executives discussed the company's IP portfolio and its strategy and plans to develop Direct

Biologics' proprietary technology. McQueen still has detailed knowledge of this highly secret information, including the secret manufacturing innovations which give Direct Biologics a competitive advantage in the industry.

100. On information and belief, McQueen has shared the misappropriated documents containing Direct Biologics' trade secrets with Defendant Vivex, and/or otherwise disclosed their contents to third parties including Vivex. On information and belief, McQueen also has disclosed to Defendant Vivex Direct Biologics' trade secrets that he learned through his employment for and Membership of Direct Biologics.

101. Direct Biologics did not authorize McQueen to disclose its trade secrets to Vivex, nor did it authorize Vivex to acquire or use its trade secrets.

102. Vivex knew or should have known that McQueen had acquired and was disclosing the trade secrets by improper means: through theft, misrepresentation, and/or a violation of McQueen's duty to Direct Biologics to protect the trade secrets.

103. On information and belief, Vivex is using, or planning to use, Direct Biologics' misappropriated trade secrets to gain a competitive advantage in the marketplace.

104. As a result of Defendants' DTSA violations, Direct Biologics has sustained, and will continue to sustain, irreparable harm.

105. Direct Biologics also will sustain damages from Defendants' misappropriation.

106. McQueen and Vivex have been and will continue to be unjustly enriched by their misappropriation and use of a competitors' trade secrets.

107. Because Defendants' misappropriation was willful and malicious, Direct Biologics is entitled to exemplary damages under 18 U.S.C. § 1836(b)(3)(C).

32

**Count 3: Texas Uniform Trade Secrets Act ("TUTSA")**
**Tex. Civ. Prac. & Rem. Code §§ 134A**
(All Defendants)

108.    Direct Biologics repeats and re-alleges the foregoing allegations as if fully set forth herein.

109.    As alleged in Count 2, Direct Biologics' confidential and proprietary information includes.

110.    Each category of proprietary and confidential information is a trade secret within the meaning of Tex. Civ. Prac. & Rem. Code § 134A.002(6).

111.    Direct Biologics derives economic value and competitive advantage from this information not being known or used by its competitors or others.

112.    As alleged in Count 2, Direct Biologics has taken appropriate steps to ensure the confidentiality of this information.

113.    Defendants have misappropriated Direct Biologics trade secrets in violation of the Texas Uniform Trade Secrets Act, Tex. Civ. Prac. & Rem. Code §§ 134A *et seq*., as described herein.

114.    As alleged in Count 2, McQueen has forwarded and saved information on personal accounts and/or other unauthorized devices and accessed Direct Biologics' systems after his termination for cause. He also has detailed knowledge of Direct Biologics' trade secrets, including information about product formulation.

115.    On information and belief, McQueen still possesses Direct Biologics' trade secret information in his personal Dropbox account, under his exclusive control, and also maintained this and other proprietary and confidential information on his computer hard drive, his personal devices and/or has maintained hard copies of documents in his home.

116.    On information and belief, McQueen has shared the misappropriated documents containing Direct Biologics' trade secrets with Defendant Vivex, and/or otherwise disclosed their contents to third parties including Vivex. On information and belief, McQueen also has disclosed to Defendant Vivex Direct Biologics' trade secrets that he learned through his employment for and Membership of Direct Biologics.

117.    Direct Biologics did not authorize McQueen to disclose its trade secrets to Vivex, nor did it authorize Vivex to acquire or use its trade secrets.

118.    Vivex knew or should have known that McQueen had acquired and was disclosing the trade secrets by improper means: through theft, misrepresentation, and/or a violation of McQueen's duty to Direct Biologics to protect the trade secrets.

119.    On information and belief, Vivex is using, or planning to use, Direct Biologics' misappropriated trade secrets to gain a competitive advantage in the marketplace.

120.    As a result of Defendants' TUTSA violations, Direct Biologics has sustained, and will continue to sustain, irreparable harm.

121.    Direct Biologics also will sustain damages from Defendants' misappropriation.

122.    McQueen and Vivex have been and will continue to be unjustly enriched by their misappropriation and use of a competitors' trade secrets.

123.    Because Defendants' misappropriation was willful and malicious, Direct Biologics is entitled to exemplary damages and attorney's fees under Tex. Civ. Prac. & Rem. Code §§ 134A.004(b) and 134A.005(3).

### Count 4: Breach of Contract – Confidential Information
#### (Defendant McQueen)

124.    Direct Biologics repeats and re-alleges the foregoing allegations as if fully set forth herein.

125.   The Employment Agreement prohibits McQueen from using, reproducing, disclosing or delivering, "directly or indirectly, any Confidential Information except to the extent necessary to perform [his] duties as an employee of [Direct Biologics] or as permitted by a duly authorized representative of [Direct Biologics]." Likewise, the Operating Agreement requires that McQueen not "divulge, furnish, make available or disclose any Confidential Information in any manner, to [anyone], except with respect to business of the Company" and pursuant to a Board-approved Confidentiality Agreement; and (ii) not to "use any Confidential Information for [himself] or for any other Person except as may be necessary in connection with the performance of [his] duties" as a Member. Operating Agreement § 17.1(a).

126.   In exchange for these promises, Direct Biologics shared confidential and proprietary information with McQueen, including its mostly guarded secret: the exact formulation for its products. The company has performed each of its material obligations under the Agreements.

127.   McQueen misappropriated Direct Biologics' confidential and proprietary information, including its trade secrets, at a minimum by .

128.   On information and belief, McQueen breached the restrictions on use of Direct Biologics' CI by (1) sharing CI with persons outside the company while preparing to compete, (2) using this CI for his own advantage to gain employment with Vivex, and (3) using this CI to the advantage of a third party, Vivex.

129.   As a result of McQueen's disclosure of CI, Direct Biologics has suffered damages for which it is entitled to monetary relief in an amount to be established in arbitration, including but not limited to damages for loss of business, future loss of business, the loss of the expectancy

value of the assets, and disclosure of Direct Biologics' competitively sensitive information, all in an amount to be established in arbitration.

## Count 5: Breach of Contract – Non-Solicitation
### (Defendant McQueen)

130.    Direct Biologics repeats and re-alleges the foregoing allegations as if fully set forth herein.

131.    McQueen's Employment Agreement also prevents him from "directly or indirectly solicit[ing], hir[ing], induc[ing], recruit[ing], or encourage[ing] any officer, director, employee, independent contractor, or consultant of [Direct Biologics], who was employed by or affiliated with [Direct Biologics] at the time of [McQueen]'s termination" from leaving the company for a competitor for one year. Employment Agreement § 6.3 ("Non-Solicitation of Employees"). The Operating Agreement imposes a similar three-year prohibition barring McQueen from "in any way, solicit[ing] or hir[ing] for employment or for engagement as an independent contractor in a business that is competitive with the business of [Direct Biologics]" any Direct Biologics employee or independent contractor working for Direct Biologics at the time of or in the twelve months prior to the solicitation. Operating Agreement § 17.1(d) ("Solicitation for Employment").

132.    On information and belief, McQueen has breached these covenants by encouraging employees to leave the company and directly compete with Direct Biologics.

133.    As a result of McQueen's breaches of his non-solicitation obligation, Direct Biologics has suffered damages for which it is entitled to monetary relief in an amount to be established in arbitration, including but not limited to damages for loss of business, future loss of business, the loss of the expectancy value of the assets, and disclosure of Direct Biologics' competitively sensitive information, all in an amount to be established in arbitration.

## Count 6: Breach of Contract – Duty of Loyalty
### (Defendant McQueen)

134.    Direct Biologics repeats and re-alleges the foregoing allegations as if fully set forth herein.

135.    McQueen's Employment Agreement confirmed that, as an employee of Direct Biologics, he owed the company a duty of loyalty which included "expend[ing [his] best efforts on behalf of [Direct Biologics] and abid[ing] by all policies and decisions made by [Direct Biologics] . . . and (b) act[ing] in the best interest of [Direct Biologics]. During employment… including but not limited to employment or business activity that is competitive with, or would otherwise conflict with or distract from employment by [Direct Biologics]." Employment Agreement § 3.2.

136.    McQueen breached this obligation when, on information and belief, he (i) was engaged in discussions with a former Direct Biologics employee about marketing competing products on behalf of a competitor and/or starting a competing business, (ii) ignored requests and instructions from management about how to cultivate and manage several key relationships for the company, and ultimately damaged those relationships, and (iii) prepared to compete with Direct Biologics by using and sharing CI and trade secrets shared with him during his employment.

137.    As a result of McQueen's contractual breaches, Direct Biologics has suffered damages for which it is entitled to monetary relief in an amount to be established in arbitration, including but not limited to damages for loss of business, future loss of business, the loss of the expectancy value of the assets, and disclosure of Direct Biologics' competitively sensitive information, all in an amount to be established in arbitration.

## Count 7: Breach of Fiduciary Duty
### (Defendant McQueen)

138.     Direct Biologics repeats and re-alleges the foregoing allegations as if fully set forth herein.

139.     The elements of a claim for breach of fiduciary duty are (i) the existence of a fiduciary duty, (ii) breach of the duty, (iii) causation, and (iv) damages.

140.     Under Texas common law, an employee owes his employer fiduciary duties.

141.     McQueen breached this duty when he actively engaged in insubordination and refused to follow the instructions of his superiors at Direct Biologics, including failing to complete his assigned duties. On information and belief, McQueen further breached his obligations by actively pursuing opportunities to market and sell competing products while still employed at Direct Biologics.

142.     McQueen's actions damaged Direct Biologics for which it is entitled to monetary relief in an amount to be established in arbitration. As a direct result of his failure to complete tasks as expressly instructed, Direct Biologics lost partnerships with key opinion leaders, vendors, sales consultants, and two customers. McQueen's acts and omissions also damaged Direct Biologics' relationship with a key vendor enough to subject Direct Biologics to the threat of legal action. Accordingly, Direct Biologics will seek monetary relief including but not limited to damages for loss of business, future loss of business, and the loss of the expectancy value of the assets, all in an amount to be established in arbitration.

## Count 8: Tortious Interference with Contract
### (Defendant Vivex)

143.     Direct Biologics repeats and re-alleges the foregoing allegations as if fully set forth herein.

144.    Direct Biologics is a party to several valid and enforceable contracts with Defendant McQueen, including but not limited to the Employment Agreement and the Operating Agreement.

145.    These contracts impose enforceable obligations on McQueen, including to refrain from becoming an employee of a Direct Biologics competitor for, at a minimum, one year after leaving Direct Biologics, and to protect Direct Biologics' trade secret and Confidential Information and not disclose it to any third parties.

146.    Defendant Vivex willfully and intentionally interfered with these contracts by hiring McQueen as an employee within days of his leaving Direct Biologics, even though Vivex knew or should have known that McQueen was subject to contractual non-competition covenants for a defined period after his employment ended.  Furthermore, Vivex continued to employ McQueen even after Direct Biologics notified Vivex that McQueen's employment at Vivex breached his contractual obligations to Direct Biologics.  Defendant Vivex further willfully and intentionally interfered with Direct Biologics' contracts by encouraging and/or inducing McQueen to misappropriate, disclose, and/or use Direct Biologics' trade secrets and  confidential information, including by revealing it to Vivex, even though Vivex knew or should have known that McQueen's doing so breached his contracts with Direct Biologics.

147.    As a result of Vivex's past and ongoing interference with Direct Biologics' contracts with McQueen, Direct Biologics has sustained, and will continue to sustain, irreparable harm.

148.    Direct Biologics also has sustained, and will sustain, damages from Vivex's tortious interference, in an amount to be established in arbitration.

**Request for Attorneys' Fees Under Tex. Civ. Prac. & Rem. Code § 38.001.**

149.   In addition to the foregoing relief, Direct Biologics also seeks its reasonable attorneys' fees and costs under Tex. Civ. Prac. & Rem. Code § 38.001.

## VI.   JURY DEMAND

150.   Direct Biologics requests a trial by jury on any claims not subject to arbitration.

## VII.   CONDITIONS PRECEDENT

151.   All conditions precedent for relief have been performed, occurred, or have been excused or waived.

## VIII.   RELIEF SOUGHT

152.   Plaintiff prays for the following relief:

a.   That the Court promptly hear and rule Plaintiff's contemporaneously filed motions seeking emergency injunctive relief and associated expedited discovery, to protect Direct Biologics from imminent, irreparable harm until its claims can be resolved through arbitration; and

b.   Such other and further relief in law or equity to which Plaintiff may show itself justly entitled, including but not limited to damages, fees, interests, and costs to which Direct Biologics is entitled for causes of action asserted herein that are not ultimately resolved in arbitration.

Dated: April 25, 2022                    Respectfully submitted,

                                         /s/ Ryan A. Botkin
                                         Ryan A. Botkin
                                         Texas State Bar 00793366
                                         ryan@wittliffcutter.com
                                         María Amelia Calaf
                                         Texas State Bar 24081915
                                         mac@wittliffcutter.com
                                         Asra Syed
                                         Texas State Bar No. 24119398
                                         asra@wittliffcutter.com

                                         **WITTLIFF | CUTTER PLLC**
                                         1209 Nueces Street
                                         Austin, Texas 78701
                                         T: (512) 960-4865
                                         F: (512) 960-4869

                                         **ATTORNEYS FOR PLAINTIFF**
                                         **DIRECT BIOLOGICS, LLC**

## CERTIFICATE OF SERVICE

I hereby certify that on this 25th day of April 2022, a true and correct copy of this document was served on all counsel of record who have appeared in this case using the Court's CM/ECF system as a Filing User. In addition, this document was served via e-mail on the following parties, who are not registered on CM/ECT as Filing Users:

Gary R. Kessler P.C.
Martenson, Hasbrouck & Simon LLP
2573 Apple Valley Road NE
Atlanta, Georgia 30319
gkessler@martensonlaw.com

                                         /s/ Ryan Botkin
                                         Ryan A. Botkin