## IN THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

| | | |
|---|---|---|
| DIRECT BIOLOGICS, LLC | ) | |
| | ) | |
| *Plaintiff*, | ) | |
| | ) | |
| v. | ) | Case No. 1:22-cv-00381-LY |
| | ) | |
| ADAM MCQUEEN, | ) | |
| VIVEX BIOLOGICS, INC., and | ) | |
| VIVEX BIOLOGICS GROUP, INC., | ) | |
| | ) | |
| *Defendants*. | ) | |

## PLAINTIFF DIRECT BIOLOGICS, LLC'S OPPOSED APPLICATION FOR TEMPORARY RESTRAINING ORDER AND A PRELIMINARY INJUNCTION

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITES .................................................................................................... iii

INTRODUCTION ............................................................................................................. 1

SUMMARY OF RELEVANT FACTS .......................................................................... 2

    A.    McQueen's Position at Direct Biologics Gave Him Access to Its Most Highly Confidential Information and Trade Secrets.......................................... 2

    B.    McQueen Agreed Not to Compete with Direct Biologics and Signed Enforceable Valid Noncompete Covenants ............................................... 5

    C.    McQueen Agreed to Protect Direct Biologics' Confidential and Trade Secret Information ................................................................................... 6

    D.    McQueen Joined Direct Biologics' Direct Competitor Just Days After Direct Biologics Terminated His Employment.......................................... 7

    E.    McQueen Misappropriated Direct Biologics' Confidential and Trade Secret Information ................................................................................... 8

ARGUMENT AND AUTHORITY ............................................................................... 10

I.    DIRECT BIOLOGICS IS LIKELY TO SUCCEED ON THE MERITS ........................ 11

    A.    McQueen Is Bound by Valid, Enforceable Noncompete Covenants.................. 11

           1.    *The Covenants Are Part of Enforceable Contracts* ................................. 12

           2.    *The Agreements Contain Reasonable Restrictions on Time, Geography, and Scope* .......................................................................... 13

           3.    *The Non-Compete Clauses Are Narrowly Tailored* ............................... 16

    B.    McQueen Has Brazenly Violated and Continues to Breach Contractual Covenants Protecting Direct Biologics' Confidential Information—While McQueen and Vivex Together Have Violated and Continue to Violate Statutes............................................................................................................ 16

           1.    *Direct Biologics Trade Secrets are Highly Valuable and Reasonable Steps are Taken to Protect their Confidentiality* ................. 16

           2.    *McQueen Breached the Agreements; McQueen and Vivex Misappropriated Trade Secrets* ............................................................. 18

II.    A TRO AND PRELIMINARY INJUNCTION ARE NECESSARY TO PREVENT IMMEDIATE AND IRREPARABLE HARM TO DIRECT BIOLOGICS' LEGITIMATE BUSINESS INTERESTS.................................................. 18

III.     THE BALANCE OF HARDSHIPS AND THE PUBLIC INTEREST WEIGHT
         DECIDEDLY IN FAVOR OF INJUNCTIVE RELIEF ................................................... 19

CONCLUSION ............................................................................................................................ 20

## <u>TABLE OF AUTHORITES</u>

**Cases**

*Accruent, LLC v. Short*,
No. 1:17-CV-858-RP, 2018 WL 297614 (W.D. Tex. Jan. 4, 2018) ................................ 14

*AHS Staffing, LLC v. Quest Staffing Group, Inc*.,
335 F. Supp. 3d 856 (E.D. Tex. 2018)....................................................................... 20

*Alex Sheshunoff Mgmt. Servs., L.P. v. Johnson*,
209 S.W.3d 644 (Tex. 2006)............................................................................. 12, 14

*Am. Fracmaster, Ltd. v. Richardson*,
71 S.W.3d 381 (Tex. App.—Tyler 2001, no pet.) ........................................................ 13

*AmeriPath, Inc. v. Hebert*,
447 S.W.3d 319 (Tex. App.—Dallas 2014, pet. denied).................................................. 14

*AMF Tuboscope v. McBryde*,
618 S.W.2d 105 (Tex. App.—Corpus Christi 1981, no writ)............................................ 13

*Butler v. Arrow Mirror & Glass, Inc.*,
51 S.W.3d 787 (Tex. App.—Houston [1st Dist.] 2001, no pet.) ............................... 14, 15

*Cambridge Strategics, LLC v. Cook*,
Civil Action No. 3:10-CV-2167-L, 2010 U.S. Dist. LEXIS 133702
(N.D. Tex. Dec. 17, 2010) ..................................................................................... 20

*Cardinal Health Staffing Network, Inc. v. Bowen*,
106 S.W.3d 230 (Tex. App.—Houston [1st Dist.] 2003, no. pet.) ................................... 18

*Chandler v. Mastercraft Dental Corp.*,
739 S.W.2d 460 (Tex. App.—Ft. Worth 1987, writ denied) ........................................... 13

*Cyrus One LLC v. Levinsky*,
Civil Action No. 4:19-CV-00043, 2019 U.S. Dist. LEXIS 154803
(E.D. Tex. Sep. 11, 2019) ..................................................................................... 20

*Daily Instruments Corp. v. Heidt*,
998 F. Supp. 2d 553 (S.D. Tex. 2014) ...................................................................... 14

*Daniels Health Scis., L.L.C. v. Vascular Health Scis., L.L.C.*,
710 F.3d 579 (5th Cir. 2013) ................................................................................. 11

*DeSantis v. Wackenhut Corp.*,
793 S.W.2d 670 (Tex. 1990)................................................................................... 13

*Electro-Motor, Inc. v. Indus. Apparatus Servs., Inc*.,
390 B.R. 859 (Bankr. E.D. Tex. 2008) ...................................................................... 18

*Gallagher Healthcare Ins. Servs. v. Vogelsang*,
312 S.W.3d 640, 655 (Tex. App. 2009)...................................................................... 13

*Google, Inc. v. Hood*,
822 F.3d 212 (5th Cir. 2016) ................................................................................. 10

*Heil Trailer Int'l Co. v. Kula*,
    542 F. App'x 329 (5th Cir. 2013) .................................................................................... 18

*Heritage Operating, L.P. v. Rhine Brothers, LLC*,
    No. 02-10-0474-CV, 2012 WL 2344864 (Tex. App.—Ft. Worth
    June 21, 2012, no pet.) ............................................................................................... 19

*Intel Corp. v. Rais*,
    No. 1:19-cv-20-RP, 2019 U.S. Dist. LEXIS 4932 (W.D. Tex. Jan. 10, 2019) .......... 10, 19

*Johnson Serv. Grp., Inc. v. Olivia France*,
    763 F. Supp. 2d 819 (N.D. Tex. 2011) ..................................................................... 19

*Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*,
    289 S.W.3d 844 (Tex. 2009) ...................................................................................... 12

*Marsh USA Inc. v. Cook*,
    354 S.W.3d 764 (Tex. 2011) ................................................................................. 12, 13

*McKissock, LLC v. Martin*,
    267 F. Supp. 3d 841 (W.D. Tex. 2016) ...................................................................... 14

*M-I LLC v. Stelly*,
    733 F. Supp. 2d 759 (S.D. Tex. 2010) ....................................................................... 12

*Providence Title Ins. Co. v. Truly Title, Inc.*,
    547 F. Supp. 3d 585 (E.D. Tex. 2021) ....................................................................... 14

*Sirius Computer Sols., Inc. v. Sparks*,
    138 F. Supp. 3d 821 (W.D. Tex. 2015) ...................................................................... 18

*Stone v. Griffin Comms. & Sec. Sys., Inc.*,
    53 S.W.3d 687 (Tex. App.—Tyler 2001, no pet.) ........................................................ 13

*Sunbelt Rentals, Inc. v. Holley*,
    No. 3:21-CV-3241-N, 2022 WL 827126 (N.D. Tex. Mar. 18, 2022) ....................... 19, 20

*Texas v. Seatrain Int'l, S.A.*,
    518 F.2d 175 (5th Cir. 1975) ..................................................................................... 10

*TFC Partners, Inc. v. Stratton Amenities, LLC*,
    No. 1:19-CV-58-RP, 2019 WL 369152 (W.D. Tex. Jan. 30, 2019) ............... 11, 17, 19, 20

*W. Gulf Mar. Asso. v. Int'l Longshoremen's Asso.*,
    413 F. Supp. 372 (S.D. Tex. 1975) ........................................................................... 20

*Wright v. Sport Supply Grp., Inc.*,
    137 S.W.3d 289 (Tex. App.—Beaumont 2004, no pet.) ............................................... 18

**Statutes**

18 U.S.C. § 1836 ............................................................................................................. 16

18 U.S.C. § 1839(3) ......................................................................................................... 17

18 U.S.C. § 1839(5) ......................................................................................................... 17

18 U.S.C. § 1839(6)(A) .................................................................................................... 17

Tex. Bus. & Com. Code § 15.50 ................................................................ 12

**Rules**

Tex. Civ. Prac. & Rem. Code § 134A ...................................................... 16

Tex. Civ. Prac. & Rem. Code § 134A.002(2) ........................................... 17

Tex. Civ. Prac. & Rem. Code § 134A.002(3) ........................................... 17

Tex. Civ. Prac. & Rem. Code § 134A.002(6) ........................................... 17

Plaintiff Direct Biologics, LLC ("Direct Biologics") applies for a temporary restraining order ("TRO") and a preliminary injunction under Federal Rule of Civil Procedure 65 against Defendants Adam McQueen ("McQueen"), Vivex Biologics, Inc. and Vivex Biologics Group, Inc. (collectively "Vivex"), and respectfully requests that the Court set a hearing as soon as the Court's schedule permits.

## INTRODUCTION

Direct Biologics seeks to (i) enforce valid noncompete covenants to prevent Defendant McQueen from working for Defendant Vivex, a direct competitor, and (ii) prevent disclosure of Direct Biologics' confidential information and trade secrets in violation of Texas and federal law.

McQueen was one of Direct Biologics' first hires, a Member of the LLC, and part of the company's C-level strategy and operations teams. As such, McQueen had access to every aspect of Direct Biologics' business—from the most carefully guarded trade secrets, including product formulation, to the tiniest manufacturing details. In effect, McQueen had a front-row seat as Direct Biologics developed its innovative regenerative medicine technologies from concept to products. Precisely because of McQueen's unique position overseeing functions as wide ranging as marketing and clinical education, McQueen was asked to, and did, execute no fewer than *four* contracts with Direct Biologics imposing restrictive non-compete obligations, as well as obligations to protect Direct Biologics' confidential and trade secret information.

McQueen breached those covenants, and his obligations to the company under state and federal law, when he defiantly joined Direct Biologic's direct competitor, Vivex, just days after his termination. The circumstances of McQueen's departure from Direct Biologics suggest an orchestrated effort to siphon off Direct Biologics' hard-earned expertise to benefit McQueen and Vivex, Direct Biologics' rival in a highly competitive and lucrative market. After months of repeated warnings and admonitions for failing to meet job responsibilities, McQueen was

terminated for cause on March 29, 2022. Just four days later, Direct Biologics learned McQueen had already joined Vivex as a senior-level employee, in defiance of the noncompete covenants in his Employment Agreement and the Operating Agreement he adopted when he became a Member of Direct Biologics. McQueen not only ignored his contractual promise not to compete with Direct Biologics, but a preliminary review of McQueen's work computer (pending the results of a forensic analysis that is currently underway), revealed McQueen linked his personal Dropbox account to Direct Biologics' system while still employed, and saved highly confidential and trade secret documents, including a pricing spreadsheet, training protocols, and documents discussing Direct Biologic's patent portfolio information and strategies.

Accordingly, Direct Biologics seeks: (1) an immediate TRO directing McQueen and Vivex to (i) comply with the noncompete covenants, (ii) return and stop accessing, using, or sharing Plaintiff's confidential and trade secret information, and (iii) prevent spoliation of any evidence, pending consideration of its request for a preliminary injunction; (2) a preliminary injunction hearing set for no later than 14 days from the date of this application; and (3) entry of a preliminary injunction enjoining McQueen and Vivex from (i) violating the noncompete covenants, and (ii) accessing, using, or sharing Direct Biologics' confidential and trade secret information.[1]

## SUMMARY OF RELEVANT FACTS

### A. McQueen's Position at Direct Biologics Gave Him Access to Its Most Highly Confidential Information and Trade Secrets

Based in Austin, Texas, Direct Biologics is a trailblazing biotechnology company focused on cellular and regenerative therapies. Schmidt Decl. ¶ 4. Direct Biologics' scientific innovation,

---

[1] Direct Biologics also seeks expedited discovery to assist in presenting a full record in support of its request for a preliminary injunction at the hearing, as set forth in Plaintiff Direct Biologics, LLC's Opposed Motion for Expedited Discovery filed contemporaneously with this application. Direct Biologics anticipates supplementing this request for a preliminary injunction in light of any discovery permitted and obtained that further supports its request for a preliminary injunction.

deep knowledge, and industry expertise have made it uniquely successful in bringing life-saving therapeutic biopharmaceutical products to market. *Id*. Direct Biologics has two main product lines: AmnioWrap™ and ExoFlo.™

- The AmnioWrap product line offers a unique allographic skin substitute for slow-healing wounds, with wide-ranging applications in ophthalmology, wound care, burn injury, and general surgery.

- The ExoFlo product line implements a proprietary extracellular vesicle ("EV") technology, which combines growth factors, regulatory proteins, and EVs including exosomes. ExoFlo uses the body's own communication and signaling systems to stimulate targeted activation of natural healing processes to reduce inflammation and restore and maintain tissue health.

As one of Direct Biologics' first employees and a Member of the company, McQueen was one of the few employees with access to proprietary and trade secret information about both of Direct Biologics' product lines. *Id*. ¶¶ 16-17. Indeed, at one time, McQueen served as the Executive Vice President for Marketing, Regulatory, Clinical and Medical Education with responsibilities for product strategies, pricing, marketing, sales and client development, operations, production and manufacturing, regulatory, compliance and clinical aspects of the business. Because of his unique position, McQueen was involved in senior level meetings discussing all aspects of both the AmnioWrap and ExoFlo product lines, ranging from the tiniest manufacturing details to broad market strategies, and everything in between. *Id*. ¶¶ 15-20. He also served on Direct Biologics' Intellectual Property Steering Committee—one of the company's most important committees—and attended the Direct Biologics Intellectual Property Summit in Las Vegas in fall 2020, where he learned about the company's plans for future products. *Id*. ¶ 18.

McQueen's deep knowledge of every aspect of Direct Biologics' business cannot be overstated. Until his termination, McQueen was responsible for spearheading the initiative to bring AmnioWrap to market and marketing this product to customers throughout the United States. *Id*. ¶ 17. His detailed knowledge about AmnioWrap is critical because this product currently provides

Direct Biologics' *only* source of revenue. McQueen also has intimate knowledge about the flagship ExoFlo products. Indeed, he is one just a handful of individuals who know the company's most closely guarded secret: the formula and production specifications for ExoFlo. *Id*. ¶ 16. This knowledge alone poses a grave risk to Direct Biologics. Just last month, Direct Biologics successfully completed a Phase II trial that confirmed ExoFlo's safety and efficacy to treat various conditions, and with the FDA's approval, launched a Phase III clinical trial, the final phase prior to drug application and approval. *Id*. Direct Biologics is the *only* company ever to accomplish this milestone for a purely biologic EV drug. Upon completion of Phase III clinical trials, Direct Biologics is poised to become the *first* biologics EV drug to ever receive FDA approval for commercial use in the United States. *Id*. Disclosure of Direct Biologics' ExoFlo formulation would allow Vivex to replicate Direct Biologics' unique success, without expending any of the time and money required to develop this knowledge independently. *Id*. ¶ 38.

This is not the only critical knowledge McQueen possesses. For example, McQueen regularly attended weekly calls that addressed Direct Biologics' research and development, manufacturing, and distribution operations in granular detail. *Id*. ¶ 20. The calls discussed information critical to Direct Biologics' operations, such as its vendors and facilities (including for cell banking), product manufacturing, lyophilization, storage and shipping, packaging, labeling, printing, quality control, and more. *Id*. This is important because Direct Biologics begins with source materials from cell banks and then uses a secret process—namely, a proprietary "certified good manufacturing practice" ("cGMP") that Direct Biologics developed and implemented in-house—to magnify the EV functionality and ensure a consistent, reliable bioactivity level. *Id*. ¶ 8. McQueen has detailed knowledge of this cGMP process, which provides a competitive edge to Direct Biologics and makes it ExoFlo product unique in the marketplace. *Id*. ¶ 16. Similarly, during these calls McQueen learned about Direct Biologics' proprietary

lyophilization process, by which it transforms ExoFlo into a nano-powder that, when reconstituted in a saline solution, is shelf-stable at room temperature. *Id.* ¶ 20. The lyophilization process is another trade secret differentiating Direct Biologics' products, because other EV products must be refrigerated. Discovering either of these secret processes would afford Vivex an unfair advantage.

### B.  McQueen Agreed Not to Compete with Direct Biologics and Signed Enforceable Valid Noncompete Covenants

Because of the scope of his responsibilities and his unique access to sensitive information, McQueen was required to sign no fewer than *four* contracts with Direct Biologics imposing non-compete obligations. *Id.* ¶¶ 21-25. For purposes of this application, Direct Biologics focuses on two agreements: (i) the Amended Employment Agreement executed in 2021 ("Employment Agreement") as a condition of his continued employment, and (ii) the Second Amended & Restated Operating Agreement ("Operating Agreement"), which binds McQueen due his position as a Member of the LLC. Calaf Decl., Exs. A-B.

McQueen's Employment Agreement provides in relevant part:

> [McQueen] shall not, during employment and for a period of **one year following termination**, own or **provide services as an employee** or contractor similar to that which [McQueen] provided to [Direct Biologics], to any **entity that competes** with [Direct Biologics'] Business of . . . developing, producing, manufacturing, providing, soliciting orders for, selling, distributing, or marketing . . . in any state of the United States of America in which [Direct Biologics] does business, . . . **any regenerative medical products** that (i) [Direct Biologics] currently anticipates developing, producing, providing, marketing, distributing or selling, (ii) [Direct Biologics] develops, produces, provides, markets or distributes [during McQueen's employment], or (iii) are in development before or when [McQueen's] employment terminates and about which [McQueen] received trade secret or Confidential Information.

Employment Agreement at ¶ 6.1 ("Covenant Not to Compete"), Calaf Decl., Ex. A (emphasis added). The Operating Agreement imposes slightly broader, overlapping restrictions:

> [S]o long as [McQueen] remains as a Member of the Company, and for **twenty-four (24) months** upon the transfer or disposal of all of [his] Units . . . [McQueen] shall not directly or indirectly own an interest in or engage in (whether as an **employee**, principal, shareholder, partner, consultant or any other capacity) an

enterprise conducting **business activities that are the same or substantially similar to** those of the Company anywhere in the United States of America or territories thereof (the "Territory"). [McQueen] agree[s] that the broad interpretation of this restriction Is necessary in light of the potentially broad application of [Direct Biologics'] Technology . . . and in order to protect the Company's interests.

Operating Agreement § 17.1(b) ("Restrictions on Competition"), Calaf Decl., Ex. B (emphasis added).

### C. McQueen Agreed to Protect Direct Biologics' Confidential and Trade Secret Information

McQueen also contractually agreed to protect Direct Biologic's confidential information and trade secrets. In exchange for Direct Biologics agreeing to "provide [McQueen] with Confidential Information in the course of [his] employment." McQueen promised that he:

during employment and at all times thereafter, will hold the Confidential Information in strict confidence and will not use, reproduce, disclose or deliver, directly or indirectly, any Confidential Information except to the extent necessary to perform [his] duties as an employee of [Direct Biologics] or as permitted by a duly authorized representative of [Direct Biologics]. [McQueen] will use best efforts to prevent the unauthorized use, reproduction, disclosure, or delivery of Confidential Information by others.

Employment Agreement § 5.4, Calaf Decl., Ex. A ("Restrictions on Confidential Information").

The Employment Agreement provides a comprehensive definition of "Confidential Information," specifically including, but not limited to, Direct Biologics':

- Research and development materials, including without limitation, information relating to clinical trials, patents or patent applications, trade secrets, Direct Biologics' products including those in development, biological materials used or considered by Direct Biologics, pre-clinical research, clinical research, experimental work, technical or engineering know-how, . . . processes, formulas, algorithms, methods, techniques, works in process, systems, technologies, disclosures, applications and other materials;

- financial information and materials, including, without limitation, information and materials relating to costs, vendors, suppliers, licensors, profits, markets, sales, distributors, … customers, subscribers, … whether existing or potential;

- business and marketing information and materials, including, without limitation, information and materials relating to future development and new product concepts;

- any other information or materials relating to the past, present, planned or foreseeable business, products, developments, technology or activities ….

Similarly, in the Operating Agreement, McQueen agreed to detailed provisions protecting Direct Biologics' confidential information and trade secrets, including promising (i) not to "divulge, furnish, make available or disclose any Confidential Information in any manner, to [anyone], except with respect to business of the Company" and pursuant to a Board-approved Confidentiality Agreement; and (ii) not to "use any Confidential Information for [himself] or for any other Person except as may be necessary in connection with the performance of [his] duties" as a Member. *See* Operating Agreement § 17.1(a), Calaf Decl., Ex. B. The Operating Agreement defines Confidential Information as:

> all information used in or relating to the Intellectual Property or the business of the Company which is not generally known to the competitors of the Company, whether or not a trade secret as defined under applicable law, and which gives an advantage to the Company….

*Id.*

Furthermore, on January 21, 2022, McQueen executed an affidavit before a Travis County Notary Public, reiterating his duties to protect Direct Biologics' confidential information, swearing that he was and had been fully compliant with them, and confirming that he understood the ramifications should he breach those duties. Calaf Decl., Ex. C.

### D. McQueen Joined Direct Biologics' Direct Competitor Just Days After Direct Biologics Terminated His Employment

McQueen defied these agreements when he joined Direct Biologics' competitor, Vivex, as its Vice President of Strategy, just days after his termination for cause. *See* Calaf Decl., Ex. I. On March 29, McQueen received a Direct Biologics termination letter specifically reminding McQueen of his contractual non-compete and confidentiality obligations, and demanded that he return any property, documents, or materials in his possession, including the Direct Biologics' confidential information. Calaf Decl., Ex. D. A few days later, Direct Biologics management

discovered that McQueen—who importantly is still a Member and owns shares in Direct Biologics—was already employed by Vivex. Schmidt Decl. ¶¶ 15, 34.

McQueen's new employer, Vivex, directly competes with Direct Biologics. *Id*. ¶¶ 13-14. As noted above, Direct Biologics has two core product lines: its EV technology platform and its allograft solutions line, with its main product AmnioWrap. There can be no dispute that Vivex competes with Direct Biologics in the market for allograft solutions. In fact, Vivex's website makes plain that it "develops and delivers innovative allograft solutions." Calaf Decl., Ex. E. Internal Direct Biologics' documents—including one authored by McQueen—confirm Vivex is a competitor in the allograft product space, and that McQueen knew as much when he accepted an offer from Vivex's board to join as a senior executive. Calaf Decl., Exs. F-G.

Vivex is also preparing to compete in the EV technology space and is poised to do so. As McQueen was leaving Direct Biologics, he stated in his exit interview that he wanted to move to a new company where he could work more extensively in the EV space. *Id*. ¶ 14. McQueen's comments suggest Vivex is preparing to offer an EV solution. *Id*. This is not surprising as Vivex already employs several of the very small number of stem cell biologists who have the expert knowledge of EV science required to effectively develop a competing product. *Id*. And it is one of the few companies in the regenerative solutions industry positioned to understand *and* copy both the lyophilization process and the EV manufacturing process developed by Direct Biologics.

In sum, McQueen has effectively walked through Vivex's door carrying Direct Biologics' knowledge of a competing allograft product and a blueprint of how to develop and move an EV product from concept to distribution network, in flagrant violation of his promises not to compete.

### E.  McQueen Misappropriated Direct Biologics' Confidential Information

McQueen not only took critical knowledge with him; he also took documents containing confidential and trade secret information. Soon after learning that McQueen was working at Vivex,

Direct Biologics reviewed McQueen's work-issued laptop and discovered that McQueen possesses and controls a personal cloud-based storage Dropbox account into which he had been saving Direct Biologics' highly sensitive and secret documents. Although Direct Biologics is still awaiting the results of a full forensic examination, a non-expert review of his Direct Biologics' accounts showed McQueen linked his personal Dropbox account to Direct Biologics' online accounts. *See* Waldner Decl. ¶ 6. Using this Dropbox personal account, McQueen deliberately misappropriated numerous documents containing Direct Biologics' highly confidential information and trade secrets. For example, as of April 14, 2022, more than two weeks after his employment ended, McQueen had in his Dropbox account folders bearing the following names and contents:

1. "Direct Biologics/Patent Portfolio Information," which contains a Direct Biologics PowerPoint document entitled "Patent Portfolio and Strategy."

2. "Direct Biologics Sales Folder/Order Forms and Pricing," which contains the "2021 Price List" for a Direct Biologics' EV product. The document is clearly labeled "Confidential."

3. "Direct Biologics Sales Folder/Medical Information Request," including a document titled "Medical Information Request Training" that is clearly labeled "Company Confidential."

4. "Competitive Market," containing a Direct Biologics Excel spreadsheet entitled "Product and Manufacturer Matrix."

5. A folder containing draft documents detailing Direct Biologics' confidential and proprietary protocols for conducting clinical evaluations.

*See* Waldner Decl. ¶ 9, Ex. A (screenshots of files saved in McQueen's personal Dropbox account).

Direct Biologics did not discover McQueen's secret document cache until after his employment ended. Direct Biologics has never authorized McQueen to link his personal Dropbox account to its cloud-based corporate accounts, or to place company documents or information on his personal Dropbox account. Schmidt Decl. ¶ 37. Indeed, the presence of Direct Biologics' documents in McQueen's personal account violates Direct Biologics' expressly stated company policy and undercuts the sworn representations he made in early January 2022. *See* Calaf Decl., Exs. C and H. Direct Biologics has taken appropriate steps to ensure the confidentiality of this

information, including information-security measures, such as password protection; company policies restricting use and handling of this information; technological restrictions on how employees may access this information; and non-disclosure and other agreements with its employees, Members, and others, including with McQueen. Schmidt Decl. at ¶ 12.

Direct Biologics' review also suggests McQueen has been systematically deleting the documents transferred to his personal account, even after he was informed of his obligation not to destroy evidence and preserve all documents. *See* Waldner Decl. ¶¶ 10-11. Based on the information available to Direct Biologics to date, there is a real risk McQueen is spoliating that evidence. Until Direct Biologics can review and forensically analyze all of McQueen's devices, there can be no assurances that he does not have any confidential and trade secret documents in his control.

## ARGUMENT AND AUTHORITY

Injunctive relief is available, whether via a TRO or preliminary injunction, when the movant establishes: (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable injury if the injunction is not issued; (3) that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted; and (4) that the grant of an the TRO or preliminary injunction will not disserve the public interest. *See Google, Inc. v. Hood*, 822 F.3d 212, 220 (5th Cir. 2016); *Intel Corp. v. Rais*, No. 1:19-cv-20-RP, 2019 U.S. Dist. LEXIS 4932, at *3 (W.D. Tex. Jan. 10, 2019). The Fifth Circuit applies a "sliding scale" to the four factors, "tak[ing] into account the intensity of each [factor] in a given calculus." *Texas v. Seatrain Int'l, S.A.*, 518 F.2d 175, 180 (5th Cir. 1975). Here, the analysis of each of the four factors favors the requested relief. And because the factors weigh so drastically in favor of Direct Biologics, the Fifth Circuit's "sliding scale" approach leaves no doubt that the application for a TRO and preliminary injunction should be granted.

## I.      DIRECT BIOLOGICS IS LIKELY TO SUCCEED ON THE MERITS

Direct Biologics is likely to prevail on the merits of the claims alleged in its Complaint. To show a likelihood of success, the plaintiff must present a *prima facie* case, but need not prove that it is entitled to summary judgment. *TFC Partners, Inc. v. Stratton Amenities, LLC*, No. 1:19-CV-58-RP, 2019 WL 369152, at *2 (W.D. Tex. Jan. 30, 2019) (citing *Daniels Health Scis., L.L.C. v. Vascular Health Scis., L.L.C.*, 710 F.3d 579, 582 (5th Cir. 2013)). Direct Biologics has presented a *prima facie* case that (i) McQueen breached his contractual obligations not to compete when he joined Vivex, a direct competitor, just a few days after his termination; (ii) McQueen and Vivex misappropriated highly confidential and trade secret information in violation of the Texas Uniform Trade Secrets Act ("TUTSA") and the federal Defend Trade Secrets Act ("DTSA") through, at a minimum, use of McQueen's personal Dropbox account; and (iii) McQueen breached his contractual obligations not to use or disclose "Confidential Information" as defined in the Employment Agreement and the Operating Agreement. *See* Compl. at Counts 1-3.

### F.      McQueen Is Bound by Valid, Enforceable Noncompete Covenants

McQueen made valid, binding promises not to compete with Direct Biologics for a defined period of time. Specifically, under Section 6.1 of the Employment Agreement, McQueen agreed to refrain from providing "services as an employee or contractor similar to that which [McQueen] provided to [Direct Biologics], to any entity that competes" with Direct Biologics for one year following termination. Calaf Decl., Ex. A at ¶ 6.1. He additionally promised, pursuant to Section 17(b) of the Operating Agreement, not to work for "an enterprise conducting business activities that are the same or substantially similar to those of" Direct Biologics while he remains a Member of the company, and for a period of twenty-four months thereafter. Calaf Decl., Ex. B. McQueen breached those promises when he began working with Vivex a few days after his termination.

Under Texas law, a non-compete provision is enforceable if it: (i) "is ancillary to or part of an otherwise enforceable agreement at the time the agreement is made"; (ii) is reasonable "to the extent that it contains limitations as to time, geographical area, and scope of activity to be restrained"; and (iii) "do[es] not impose a greater restraint than is necessary to protect the goodwill or other business interest of the promisee." Tex. Bus. & Com. Code § 15.50. "The hallmark of enforcement is whether or not the covenant is reasonable." *Marsh USA Inc. v. Cook*, 354 S.W.3d 764, 777 (Tex. 2011). Courts may dispense with one or more factors entirely when the totality of circumstances indicates that the covenant not to compete is reasonably narrow to protect a company's business interest or goodwill. *M-I LLC v. Stelly*, 733 F. Supp. 2d 759, 799 (S.D. Tex. 2010). The covenants here easily meet each of these criteria and are reasonable.

## 1.    *The Covenants Are Part of Enforceable Contracts*

The first element is easily satisfied: the covenants not to compete are part of otherwise enforceable agreements: the Employment Agreement and Operating Agreement. *See* Calaf Decl., Exs. A-B. Duly executed by sophisticated parties, these agreements "contain[] mutual non-illusory promises." *Alex Sheshunoff Mgmt. Servs., L.P. v. Johnson*, 209 S.W.3d 644, 648-49 (Tex. 2006).

In Texas, employment agreements, like the one here, satisfy the "otherwise enforceable agreement" requirement where the employer promises to provide the employee with access to confidential information, and the employee promises not to disclose such information. *Id.* at 649 (holding non-compete agreement enforceable when employer "promised to disclose confidential information and to provide specialized training under the Agreement, and [employee] promised not to disclose confidential information"); *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 852 (Tex. 2009) (holding that promise to provide confidential information, even though merely implied, was sufficient to make non-compete ancillary to otherwise enforceable agreement). Likewise, Texas recognizes as "otherwise enforceable" those agreements admitting

employees into the ownership class of a corporation, as occurred when McQueen consented to be bound by the Operating Agreement in exchange for membership in Direct Biologics. *See Marsh*, 354 S.W.3d at 777 (non-compete was properly "ancillary to" agreement granting stock options to key employee). The first prong is easily satisfied.

### 2.   The Agreements Contain Reasonable Restrictions

The second element that the agreement be reasonable as to length, geographical area, and scope is also easily met.

Under Texas law, it is reasonable for an employee to be restrained from competing with his former employer for up to five years. *See Stone v. Griffin Comms. & Sec. Sys., Inc.*, 53 S.W.3d 687, 696 (Tex. App.—Tyler 2001, no pet.) (five-year restriction upheld), *overruled on other grounds by Am. Fracmaster, Ltd. v. Richardson*, 71 S.W.3d 381 (Tex. App.—Tyler 2001, no pet.); *Chandler v. Mastercraft Dental Corp.*, 739 S.W.2d 460, 464-465 (Tex. App.—Ft. Worth 1987, writ denied) (same). Here, McQueen is restricted from competing for twelve months after separation under the Employment Agreement; under the Operating Agreement he is prohibited from competing while a Member of the LLC and for twenty-four months after he no longer holds membership interests, which he currently retains. *See* Calaf Decl., Ex. A ¶ 6.1 and Ex. B § 17.1(b). Texas courts regularly uphold covenants of this length. *See DeSantis v. Wackenhut Corp.*, 793 S.W.2d 670, 675, 685 (Tex. 1990) (two-year non-compete is enforceable); *Gallagher Healthcare Ins. Servs. v. Vogelsang*, 312 S.W.3d 640, 655 (Tex. App. 2009) ("Two to five years has repeatedly been held as a reasonable time in a non-competition agreement."); *AMF Tuboscope v. McBryde*, 618 S.W.2d 105, 108 (Tex. App.—Corpus Christi 1981, no writ) (two-year restriction upheld).

The geographic scope here is also reasonable given the industry and McQueen's role within Direct Biologics as a senior executive overseeing Marketing, Regulatory, Clinical and Medical Education for both the company's product lines. "The breadth of enforcement of territorial

restraints in covenants not to compete depends upon the nature and extent of the employer's business and the degree of the employee's involvement." *Butler v. Arrow Mirror & Glass, Inc.*, 51 S.W.3d 787, 793 (Tex. App.—Houston [1st Dist.] 2001, no pet.); *see also AmeriPath, Inc. v. Hebert*, 447 S.W.3d 319, 335 (Tex. App.—Dallas 2014, pet. denied) (enforcing non-compete as written where knowledge of member of "highest level management team" would be useful "even if [he] were working for such a company in New York"); *Providence Title Ins. Co. v. Truly Title, Inc.*, 547 F. Supp. 3d 585, 602 (E.D. Tex. 2021) (stating non-compete could reasonably cover employer's entire operating territory, given employee's seniority and access to confidential information). "Texas courts routinely "uphold a national or global covenant whose scope exceeds an employee's territory when the scope is justified by the business interest underlying the covenant." *Accruent, LLC v. Short*, No. 1:17-CV-858-RP, 2018 WL 297614, at *4 (W.D. Tex. Jan. 4, 2018) (upholding nationwide geographic restriction on competition where necessary to protect plaintiff's confidential information).[2] Here the Employment Agreement covers "any state of the United States of America in which [Direct Biologics] does business," while the Operating Agreement applies to "anywhere in the United States of America or territories thereof." Calaf Decl., Ex. A at ¶ 6.1 and Ex. B at § 17.1(a). This geographical scope is reasonable, given Direct Biologics' nationwide sales footprint, the small number of competitors in the industry, as well as McQueen's role as a senior leader with access to information and oversight responsibilities over both product lines.  Schmidt Decl. ¶ 13.

The scope of activities restricted by the Employment Agreement and Operating Agreement

---

[2] *See also Sheshunoff*, 209 S.W.3d at 656-57 (holding that non-compete agreement provision, which "applie[d] regardless of geographic location" was "reasonable and enforceable"); *Curtis*, 12 S.W.3d at 119 (upholding restriction covering all of North America based on employee's "job description and responsibilities"); *McKissock, LLC v. Martin*, 267 F. Supp. 3d 841, 856 (W.D. Tex. 2016) (holding nationwide restriction in employee non-compete agreement reasonable); *Daily Instruments Corp. v. Heidt*, 998 F. Supp. 2d 553, 558, 568 (S.D. Tex. 2014).

reflects McQueen's role as someone who during his multi-year tenure had a broad portfolio of responsibilities across product lines. McQueen's unfettered access to all aspects of Direct Biologics' business, including proprietary and confidential information about existing and future product lines, specialized manufacturing techniques (*e.g.*, lyophilization process and the cGMP manufacturing process), critical strategic information concerning regulatory approvals and marketing, and key contacts necessary to convert the scientific concepts into medical products, among others, justify the scope of the restrictions. *See id.* ¶¶ 16-20. Moreover, the nature of the industry is such that only a handful of competitors nationwide have the knowhow and experience to market allograft solutions and/or seek FDA approval for the use of EV technology in medical applications. *Id.* ¶¶ 13-14. Accordingly, it is reasonable that under the Employment Agreement, McQueen is barred from providing services similar to those he offered his former employer for "any entity that competes with the Business of" Direct Biologics. Calaf Decl., Ex. A at § 6.1.

The Employment Agreement, in turn, defines "Business" as a company "developing, producing, manufacturing, providing, soliciting orders for, selling, distributing, or marketing Company Products and Services in any state of the United States." *Id.* The "Company Products or Services" are limited to regenerative products that Direct Biologics developed, anticipated developing or was developing at the time that McQueen was terminated. *Id.* Similarly, the Operating Agreement prevents McQueen from joining only those "enterprise[s] conducting business activities that are the same or substantially similar to those of" Direct Biologics while he remains a Member of the LLC. Calaf Decl., Ex. B at § 17.1(b). Thus, McQueen is *only* restricted from providing services to a company that offers competing regenerative products, like Vivex; not every company in the industry. Because allograft and EV products represent a niche in the much larger biotechnology industry, these restrictions are reasonable in scope, as courts in Texas have repeatedly recognized. *See, e.g.*, *Butler*, 51 S.W.3d at 794–95 (enforcing non-compete covering

new residential construction projects because it was "limited to one field among many").

### 3. The Non-Compete Clauses Are Narrowly Tailored

Lastly, the applicable covenants are narrowly tailored to protect Direct Biologics' business interest in safeguarding its trade secrets, goodwill, and other legitimate business interests. Because of McQueen's senior position and his access to all aspects of the AmnioWrap product (from the science to contacts at key partners to marketing and pricing details), permitting the employment at issue allows McQueen to walk out of Direct Biologics' door directly into the arms of its competitor, bearing with him much of the knowledge needed to undercut Direct Biologics' competitive advantage in the allograft solutions market. *See* Schmidt Decl. ¶¶ 38-39. Likewise, this opportunity appears tailor-made to enable Vivex to exploit Direct Biologics' trade secret and confidential information about its EV product line. *See id*. The scope of the activities prohibited by the non-compete covenants are thus reasonably tailored to protect Direct Biologics' legitimate business interests. Direct Biologics is likely to succeed on the merits of its breach of contract claim.

### G. McQueen Continues to Breach Contractual Covenants Protecting Direct Biologics' Confidential Information

As discussed in the preceding section, both McQueen's Employment Agreement and the Operating Agreement require him to protect Direct Biologics' confidential and proprietary information, and bar him from personally possessing it, disclosing it to any third party, and/or using it for anything purpose other than for Direct Biologics' business. *See* Employment Agreement § 5.4; Operating Agreement § 17.1(a). The TUTSA and the DTSA also bar McQueen from using or misappropriating Direct Biologics' valuable, confidential and proprietary information. *See* Tex. Civ. Prac. & Rem. Code §§ 134A *et seq*.; 18 U.S.C. § 1836 *et seq.*

### 1. Direct Biologics Took Reasonable Steps to Protect Its Confidential Information

Under both TUTSA and the DTSA, a trade secret is defined as information the owner has

taken reasonable measures to keep secret and which derives independent economic value from not being generally known or readily ascertainable through proper means. *TFC Partners,* 2019 WL 369152, at *2 (citing Tex. Civ. Prac. & Rem. Code § 134A.002(6); 18 U.S.C. § 1839(3)). "Misappropriation under both statutes includes (1) 'disclosure or use of a trade secret of another without express or implied consent by a person who ... used improper means to acquire knowledge of the trade secret' and (2) 'acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means.'" *Id.* (quoting Tex. Civ. Prac. & Rem. Code § 134A.002(3); 18 U.S.C. § 1839(5)). "Improper means" include the "breach or inducement of a breach of a duty to maintain secrecy." *Id.* (quoting Tex. Civ. Prac. & Rem. Code § 134A.002(2); 18 U.S.C. § 1839(6)(A)).

Here, the information at issue falls squarely within the definition of a trade secret under both federal and state law. McQueen has misappropriated, on information and belief, the exact formulation for ExoFlo; details regarding its proprietary manufacturing processes (*e.g.*, lyophilization process and the cGMP manufacturing process); pricing of various components; list of approved vendors and facilities used for cell banking, product storage, and shipping; product development and regulatory strategy (including details of plans for testing at various phases and planned patent filings); and identity of key contacts at the FDA and clinical trial hospitals, as well as the documents listed in Section D above that were in McQueen's Dropbox folders.

Direct Biologics has taken reasonable steps to maintain its trade secrets confidential. Direct Biologics has limited access to its trade secret information, guarded electronic access points, employed a data loss prevention program, and implemented employment agreements and policies requiring confidentiality. *E.g.*, Calaf Decl., Exs. A-B; Schmidt Decl. ¶¶ 12, 21-25. Moreover, in McQueen's final weeks, he was reminded, at least twice, of his confidentiality obligations, and was told again in writing in his termination letter. *See* Calaf Decl., Exs. C-D.

### 2. *McQueen Breached the Agreements; McQueen and Vivex Misappropriated Trade Secrets*

As set forth above, McQueen used a link he illicitly created between his personal Dropbox account and Direct Biologics' file storage system to secretly save copies of Direct Biologics' files into folders under his exclusive, personal control. The files McQueen misappropriated in this manner include highly sensitive and valuable Direct Biologics trade secrets, such as documents concerning its intellectual property, product pricing, suppliers and manufacturing, and its secret clinical trial protocols. Many of these Direct Biologics documents are explicitly marked "Confidential." On information and belief, McQueen still possesses documents containing Direct Biologics' confidential and proprietary information, and has knowledge of Direct Biologics' trade secrets, including the secret formulation for ExoFlo which is only known by a handful of employees. Direct Biologics submits, on information and belief, that McQueen has disclosed and plans to disclose this information to Vivex, in violation of his contractual and statutory obligations.

## II. A TRO AND PRELIMINARY INJUNCTION ARE NECESSARY TO PREVENT IMMEDIATE AND IRREPARABLE HARM TO DIRECT BIOLOGICS

An injury is irreparable if the injured party cannot be adequately compensated in damages or if the damages cannot be measured. *Heil Trailer Int'l Co. v. Kula*, 542 F. App'x 329, 335 (5th Cir. 2013); *Wright v. Sport Supply Grp., Inc*., 137 S.W.3d 289, 292 (Tex. App.—Beaumont 2004, no pet.). Under Texas law, "proof that a highly trained employee is continuing to breach a non-competition covenant gives rise to a rebuttable presumption that the applicant [for injunctive relief] is suffering irreparable injury." *Electro-Motor, Inc. v. Indus. Apparatus Servs., Inc*., 390 B.R. 859, 870 (Bankr. E.D. Tex. 2008) (quoting *Cardinal Health Staffing Network, Inc. v. Bowen*, 106 S.W.3d 230, 236 (Tex. App.—Houston [1st Dist.] 2003, no. pet.)). Simply put, the "injury resulting from the breach of non-compete [agreements] is the epitome of irreparable injury." *Sirius Computer Sols., Inc. v. Sparks*, 138 F. Supp. 3d 821, 841 (W.D. Tex. 2015) (noting that

enforcement of non-compete agreements by preliminary injunction "appears to be the rule rather than the exception") (internal quotations omitted); *see also Heritage Operating, L.P. v. Rhine Brothers, LLC*, No. 02-10-0474-CV, 2012 WL 2344864, at *6 (Tex. App.—Ft. Worth June 21, 2012, no pet.) (explaining that "[i]t is enough simply to prove a distinct or substantial breach" of the covenant). The presumption that Direct Biologics is suffering irreparably injury from McQueen's employment applies here because McQueen was a highly trained employee who possesses critical knowledge about Direct Biologics' business and products.

Additionally, Direct Biologics will be harmed by the misappropriation of its confidential and trade secret information. As this Court has held, "[w]hen a defendant possesses trade secrets and is in a position to use them, harm to the trade secret owner may be presumed." *TFC Partners*, 2019 WL 369152, at *4 (internal quotation marks omitted). Because McQueen has Direct Biologics' confidential and proprietary information in his possession and under his control— including the documents saved on his personal Dropbox account, as confirmed by a preliminary review of his computer—there is a threat of disclosure sufficient to establish irreparable harm.

## III.   THE BALANCE OF HARDSHIPS AND THE PUBLIC INTEREST WEIGHT DECIDEDLY IN FAVOR OF INJUNCTIVE RELIEF

The third factor requires the moving party to establish that its threatened injury outweighs the threatened harm that a TRO or preliminary injunction would cause the opposing party. *Intel Corp*, 2019 U.S. Dist. LEXIS 4932, at *3. When a court is considering an injunction that would enforce the terms of an employment agreement, "it is not imposing a hardship on [the former employee] that exceeds the terms to which she has already agreed." *Johnson Serv. Grp., Inc. v. Olivia France*, 763 F. Supp. 2d 819, 831 (N.D. Tex. 2011). In contrast, where a former employee continues to work for a company's competitor, the company could lose business. *See id*. Here "the burden imposed by a temporary injunction goes no further than the terms to which [McQueen] voluntarily consented." *Sunbelt Rentals, Inc. v. Holley*, No. 3:21-CV-3241-N, 2022 WL 827126,

at *8 (N.D. Tex. Mar. 18, 2022). The equities favor Direct Biologics.

In evaluating the fourth factor, public interest, Texas courts have repeatedly indicated that the "public interest is served by enforcing contracts entered into by the parties." *Cyrus One LLC v. Levinsky*, Civil Action No. 4:19-CV-00043, 2019 U.S. Dist. LEXIS 154803, at *20 (E.D. Tex. Sep. 11, 2019); *Cambridge Strategics, LLC v. Cook*, Civil Action No. 3:10-CV-2167-L, 2010 U.S. Dist. LEXIS 133702, at *19 (N.D. Tex. Dec. 17, 2010) (holding that "the public expects the terms of a contract to be honored"); *W. Gulf Mar. Asso. v. Int'l Longshoremen's Asso.*, 413 F. Supp. 372, 375 (S.D. Tex. 1975) (holding that "upholding and enforcing valid contracts" serves the public interest). There is no public interest in allowing individuals to improperly defy their contracts.

Nor is the public interest served by allowing McQueen to keep Direct Biologics' confidential and trade secret information. A trade-secret plaintiff's "potential loss of business and talent outweighs the burdens associated with complying with state law," and/or federal law. *See TFC Partners*, 2019 WL 369152, at *4. "[D]epriving [the defendants] of the allegedly misappropriated trade secrets serves the public interest by furthering the purposes of the TUTSA" and the DTSA. *Id.* (citing *AHS Staffing, LLC v. Quest Staffing Group, Inc*., 335 F. Supp. 3d 856, 874 (E.D. Tex. 2018)). The requested injunction serves the public interest by reinforcing fair business practices and ensuring Texans that their contractual agreements will be enforced.

## CONCLUSION

For the foregoing reasons, Direct Biologics respectfully requests that the Court (1) issue the requested TRO (2) set a preliminary injunction hearing for no later than 14 days from the date of this application; and (3) issue a preliminary injunction extending the TRO while the claims asserted here are resolved either in binding arbitration or, as to any nonarbitrable claims, in this lawsuit.

Dated: April 25, 2022                    Respectfully submitted,

                                         */s/ Ryan A. Botkin*
                                         Ryan A. Botkin
                                         Texas State Bar 00793366
                                         ryan@wittliffcutter.com
                                         María Amelia Calaf
                                         Texas State Bar 24081915
                                         mac@wittliffcutter.com
                                         Asra Syed
                                         Texas State Bar No. 24119398
                                         asra@wittliffcutter.com

                                         **WITTLIFF | CUTTER PLLC**
                                         1209 Nueces Street
                                         Austin, Texas 78701
                                         T: (512) 960-4865
                                         F: (512) 960-4869

                                         **ATTORNEYS FOR PLAINTIFF
                                         DIRECT BIOLOGICS, LLC**

## **CERTIFICATE OF CONFERENCE**

On April 21 (after Plaintiff initially filed its petition and application for injunctive relief in state court) and again on April 25, 2022 (after the action was removed to this Court), counsel for Plaintiff called and exchanged emails with counsel for Defendants in an effort to discuss the issues presented in this Motion. The parties did not reach an agreement; Defendants are opposed to this Motion.

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 25th day of April 2022, a true and correct copy of this document was served on all counsel of record who have appeared in this case using the Court's CM/ECF system as a Filing User. In addition, this document was served via e-mail on the following parties, who are not registered on CM/ECT as Filing Users:

Gary R. Kessler P.C.
Martenson, Hasbrouck & Simon LLP
2573 Apple Valley Road NE
Atlanta, Georgia 30319
gkessler@martensonlaw.com

*/s/ Ryan Botkin*
Ryan A. Botkin