## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

| | | |
|---|---|---|
| **DIRECT BIOLOGICS, LLC,** | § | |
| *Plaintiff* | § | |
| | § | |
| **v.** | § | |
| | § | **Case No.  1:22-CV-381-SH** |
| **ADAM MCQUEEN,** | § | |
| **VIVEX BIOLOGICS, INC. AND** | § | |
| **VIVEX BIOLOGICS GROUP, INC.** | § | |
| *Defendants* | § | |

## <u>ORDER</u>

Before the Court are Direct Biologics Direct Biologics, LLC's Opposed Application for Temporary Restraining Order and a Preliminary Injunction (Dkt. 6), filed April 25, 2022; Direct Biologics Direct Biologics, LLC's Opposed Motion for Expedited Discovery (Dkt. 7), filed April 25, 2022; and Adam McQueen's Opposition to Plaintiff's Application for Temporary Restraining Order and a Preliminary Injunction (Dkt. 21), filed May 3, 2022. On April 29, 2022, after the parties consented to the exercise of jurisdiction by a United States Magistrate Judge, the District Court reassigned this case to the undersigned to conduct all proceedings and order the entry of judgment in accordance with Section 636(c) of Title 28 of the United States Code and Federal Rule of Civil Procedure 73. Dkt. 15.

### I.    Background

Direct Biologics, LLC brings this breach of contract and misappropriation of trade secrets lawsuit against former employee Adam McQueen and McQueen's new employer, Vivex Biologics, Inc. and Vivex, Biologics Group, Inc. ("Vivex") (collectively, "Defendants").[1]

---

[1] Direct Biologics is a Wyoming limited liability company with its principal place of business in Austin, Texas. Complaint (Dkt. 5) ¶ 5. Defendant McQueen is a resident of Dallas, Georgia. *Id. ¶* 6. Vivex Biologics Group, Inc. is a Delaware corporation with its principal place of business is in Marietta, Georgia. *Id. ¶* 8.

### A. Facts[2]

Direct Biologics is a biotechnology company that focuses on cellular and regenerative therapies. Complaint (Dkt. 5) ¶ 16. Direct Biologics has two main product lines: AmnioWrap and ExoFlo. *Id.* ¶¶ 17-18. The AmnioWrap product line is a skin substitute for slow-healing wounds, while the ExoFlo product line uses a proprietary extracellular vesicle ("EV") technology to stimulate tissue healing processes. *Id.* In 2019, Direct Biologics launched ExoFlo, which initially did not require a license or approval from the Federal Drug Administration ("FDA"). *Id.* ¶ 18. In 2021, the FDA announced that EV products would be regulated under the Public Health Service Act as "drugs and biological products," and thus could not be marketed or sold in the United States without securing formal FDA approval. *Id.* ¶ 19. Direct Biologics alleges that this change forced ExoFlo and all its competitors to leave the market and started "a race among Direct Biologics and its competitors to secure the FDA approval required to bring (or return) their EV products to the market." *Id.* ¶ 21.

On March 11, 2022, the FDA granted Direct Biologics a regenerative medicine advanced therapy designation ("RMAT") for ExoFlo's use to treat severe or critical COVID-19. *Id.* ¶ 25. On March 24, 2022, the FDA approved ExoFlo to enter Phase III clinical trials for Exit COVID-19, which is the final stage before Direct Biologics can submit its Biologics License Application ("BLA") to offer this treatment to the consumer market. *Id.* ¶ 26. Direct Biologics alleges that if it is successful in Phase III, ExoFlo will be the first purely biologics EV drug ever to receive FDA

---

Vivex Biologics, Inc. is a Georgia corporation with its principal place of business is in Marietta, Georgia. *Id.* ¶ 9.

[2]The factual background is based on the allegations in the Complaint (Dkt. 5) and evidence and testimony presented at the hearing on Direct Biologics' Application for Temporary Restraining Order.

approval and "would make Direct Biologics the *only* company authorized to commercialize and sell a purely biologics EV drug in the United States." *Id.*

Defendant McQueen was a high-level sales and marketing executive for four years, until March 28, 2022. Direct Biologics alleges that:

> For the past four years, Defendant Adam McQueen has had a front-row seat as Direct Biologics has developed its innovative technologies, refined its manufacturing and logistics systems, contracted several key contract manufacturing organizations ("CMOs"), and navigated the FDA approval process at an extraordinary pace. As the company's third-hired employee, an equity-holding Member of the LLC, and until just recently a member of its C-level strategy and operations teams, McQueen knows all Direct Biologics' secrets. He is one of the only people in the company to have been intimately involved with both the AmnioWrap and EV product lines, and he is one of handful of individuals who knows the company's most closely guarded secret: the formula and production specifications for its flagship technology, ExoFlo.

*Id.* ¶ 28.

McQueen also served on the company's Intellectual Property Steering Committee and attended the Direct Biologics Intellectual Property Summit in Las Vegas in September 2020. *Id.* ¶ 36. Direct Biologics alleges that McQueen attended presentations from high-level employees and Direct Biologics' outside intellectual property lawyers that revealed sensitive details of the company's research and business strategies, including the details of all Direct Biologics' current trade secrets, patents and planned patent filings, its legal and regulatory strategy, specific plans for testing at various investigational review board studies and clinical trials for different ExoFlo lines, and the new EV product lines it is pursuing. *Id.* Direct Biologics further alleges that McQueen regularly attended the weekly R&D and Manufacturing calls that addressed the company's entire manufacturing and distribution operation in granular detail, and illuminated its broader product development strategy. *Id.* ¶ 37.

3

Direct Biologics alleges that McQueen was privy to "every detail of Direct Biologics' successful effort to fast-track an EV treatment from the starting block to the brink of the finish line, empowering him to bestow an extraordinary, unearned advantage on a competitor like Vivex that seeks to undercut Direct Biologics' market advantage," and that "McQueen carries with him knowledge possessed by only a handful of people anywhere: all the information Vivex needs to exactly replicate Direct Biologics' flagship product." *Id.* ¶ 39.

Direct Biologics alleges that it received ExoFlo's Phase III FDA approval on Friday, March 24, 2022. *Id.* ¶ 40. The following Monday, March 28, 2022, McQueen resigned. *Id.* Direct Biologics alleges that by week's end, McQueen accepted a job as a senior executive with one of its direct competitors, Vivex, "in direct breach of his contractual covenants." *Id.*

Direct Biologics contends that Vivex is a direct competitor with its key AmnioWrap product line and in the emerging EV field. *Id.* Direct Biologics further alleges that Vivex is one of only a few companies with the resources, infrastructure, and commercial motive to immediately and wrongfully exploit the Direct Biologics' confidential information McQueen is privy to. *Id.* Direct Biologics further alleges that as a senior manager at Vivex, McQueen is positioned to help Vivex compete with Direct Biologics' AmnioWrap product line and guide Vivex through accelerated development and FDA approval of new EV products. *Id.* ¶ 75.

Direct Biologics alleges that it was planning to terminate McQueen for cause before he tendered his resignation. *Id.* ¶ 60. Regardless, Direct Biologics sent him a termination letter on March 29, 2022. *Id.* ¶ 62. The termination letter specifically reminded McQueen of his contractual noncompete, non-solicit, and confidentiality obligations, and demanded return of any property, documents, or materials in his possession, including the company's Confidential Information. *Id.* ¶ 63.

4

After McQueen began work at Vivex, Direct Biologics alleges that it discovered that McQueen possesses and controls a cloud-based storage account into which he had been saving Direct Biologics' highly sensitive and secret documents. *Id.* ¶ 65. Direct Biologics alleges that while he was employed by Direct Biologics and subject to contractual obligations barring these actions, McQueen linked his personal Dropbox account to Direct Biologics' online accounts. *Id.* ¶ 66. "Using this Dropbox link, McQueen deliberately misappropriated to his personal control numerous documents containing Direct Biologics' Confidential Information and trade secrets, including some of the company's most sensitive proprietary information." *Id.* For example, as of April 14, 2022, more than two weeks after his employment ended, Direct Biologics alleges and provided testimony and evidence at the hearing that McQueen had in his possession, among other items:

> (1) A folder named "Direct Biologics/Patent Portfolio Information," which contains a Direct Biologics PowerPoint document entitled "Patent Portfolio and Strategy."

> (2) A folder named "Direct Biologics Sales Folder/Order Forms and Pricing," which contains, among other things, the "2021 Price List" for one of Direct Biologics' products. This document is clearly labeled "Confidential."

> (3) A folder named "Direct Biologics Sales Folder/Medical Information Request," which contains a document entitled "Medical Information Request Training" that is clearly labeled "Company Confidential."

> (4) A folder named "Competitive Market" containing a Direct Biologics Excel spreadsheet entitled "Product and Manufacturer Matrix."

> (5) A folder containing draft documents detailing Direct Biologics' confidential and proprietary protocols for conducting clinical evaluations.

*Id.* ¶ 66; Dkt. 25-1.

Direct Biologics alleges that it never authorized McQueen to link his personal Dropbox account to its cloud-based corporate accounts, or to place company documents or information on his personal cloud storage account. Direct Biologics contends that the presence of these documents in McQueen's personal cloud storage system violates its company policy, as well as the terms of multiple contracts McQueen has executed with Direct Biologics. Dkt. 5 ¶ 67.

Direct Biologics alleges that McQueen has shared the Direct Biologics files he retained, including on his personal cloud storage account, with third parties, including Vivex, and has maintained in his possession copies of the files he deleted from his cloud storage and/or other documents containing Direct Biologics confidential information and trade secrets. *Id.* ¶¶ 69-70. Direct Biologics further alleges that Vivex now possesses Direct Biologics' confidential information and trade secrets, which it received from McQueen knowing that he had misappropriated them. *Id.* ¶ 71.

## B. Agreements

While he was employed for Direct Biologics, McQueen executed several signed agreements memorializing his obligations and duties to Direct Biologics, including promises not to compete with Direct Biologics and not to solicit its customers or employees, and to protect its proprietary and confidential information. *Id.* ¶ 30. Relevant here, on October 27, 2021, McQueen executed an Amended Employment Agreement ("Employment Agreement") on October 27, 2021, in which he agreed to the following:

### 5.4  Restrictions on Confidential Information
*1)  Restrictions on Use and Disclosure*

Employer has and will provide Employee with Confidential Information in the course of Employee's employment. In exchange, Employee will, during employment and at all times thereafter, will hold the Confidential Information in strict confidence and will not

use, reproduce, disclose or deliver, directly or indirectly, any Confidential Information except to the extent necessary to perform Employee's duties as an employee of Employer or as permitted by a duly authorized representative of Employer. Employee will use best efforts to prevent the unauthorized use, reproduction, disclosure, or delivery of Confidential Information by others.

### 6.1 Covenant Not to Compete

Employee shall not, during employment and for a period of one year following termination, own or provide services as an employee or contractor similar to that which Employee provided to Employer, to any entity that competes with the Business of Employer. For purposes of this covenant, the term "Business" shall mean developing, producing, manufacturing, providing, soliciting orders for, selling, distributing, or marketing Company Products and Services in any state of the United States of America in which Employer does business. For purposes hereof, "Company Products and Services" means any regenerative medical products that (i) Employer currently anticipates developing, producing, providing, marketing, distributing or selling, (ii) Employer develops, produces, provides, markets or distributes while Employee is employed by Employer or is otherwise providing services to Employer, or (iii) are in development before or when Employee's employment terminates and about which Employee received trade secret or Confidential Information.

Dkt. 6-4 at §§ 5.4, 6.1.

On May 10, 2021, McQueen executed a Second Amended & Restated Operating Agreement

("Operating Agreement), in which he agreed to the following:

(a) **Confidential Information.** Each Manager, Member and each Member Principal acknowledges the economic value of the Confidential Information (as defined below) of the Company. Accordingly, during the Confidential Restricted Period (as defined below), each such Manager, each such Member and each such Member Principal shall not, in whole or in part, directly or indirectly:

(i) divulge, furnish, make available or disclose any Confidential Information in any manner to any Person, firm, corporation, partnership, limited liability company, association or other entity, except with respect to business of the Company where

a Confidentiality Agreement in form approved by the Board has been obtained for the benefit of the Company;

(ii) use any Confidential Information for itself or for any other Person except as may be necessary in connection with the performance of its duties hereunder; or

(iii) bring to the Company's offices nor use, disclose to the Company, or induce the Company to use, any confidential information or documents belonging to a third party.

\*\*\*

(b) **Restrictions on Competition.** Each Member and each of such Member's Member Principals covenants and agrees that so long as such Member remains as a Member of the Company, and for twenty-four (24) months upon the transfer of or disposal of all of such Member's Units (or, with respect to a Member Principal, for twenty-four months after the date at which such Person ceases to be a Member Principal) (in either such case, the "Restriction Period"), such Member or Member Principal shall not directly or indirectly own an interest in or engage in (whether as an employee, principal, shareholder, partner, consultant or any other capacity) an enterprise conducting business activities that are the same or substantially similar to those of the Company anywhere in United States of America or territories thereof (the "Territory"). The Members agree that the broad interpretation of this restriction is necessary in light of the potentially broad application of the Technology (as referenced at Exhibit A hereto) and in order to protect the Company's interests.

Dkt. 6-5 § 17.1(a), (b).

The Employment Agreement also contains the following arbitration provision:

**14 Arbitration and Venue**
Any controversy or claim arising out of or relating to this Agreement or any matter arising out of the employment relationship between Employee and Employer or the termination of such relationship shall be resolved exclusively by arbitration to take place in Austin, Texas, under the authority of the Federal Arbitration Act, according to the rules of the then-current Employment Arbitration Rules of the American Arbitration Association ("AAA"), and judgment on the award rendered by the arbitrator may be entered by any court having jurisdiction thereof in Austin, Texas.

8

> However, a party may pursue a temporary restraining order and/or preliminary injunctive relief in connection with any restrictive covenants, with related expedited discovery for the parties, in a court of law in state district court or federal court in Austin, Texas and, thereafter, require arbitration of all issues of final relief.
>
> ***
>
> The arbitrator, and not any federal, state, or local court or agency, shall have exclusive authority to resolve any dispute relating to the interpretation, applicability, enforceability or formation of this Agreement including, but not limited to any claim that all or any part of this Agreement is void or voidable.

Dkt. 6-4 at § 14.

### C. Litigation

On April 20, 2022, Direct Biologics sued McQueen and filed an Application for Temporary Restraining Order ("TRO") in state court. Dkt. 1-1. On April 21, 2022, McQueen removed this case to federal court on the basis of diversity jurisdiction, pursuant to 28 U.S.C. § 1441(a). On April 25, 2022, Direct Biologics filed a federal Complaint adding Vivex Biologics, Inc. and Vivex Biologics Group, Inc. as defendants. Dkt. 5. Direct Biologics seeks to enjoin Defendants from continuing their employment relationship, and to prevent Defendants' further misappropriation, misuse, and disclosure of Direct Biologics' confidential information and trade secret information that McQueen received though his employment with Direct Biologics and disclosed to Vivex. Direct Biologics' Complaint asserts breach of contract and breach of fiduciary duty against McQueen; tortious interference with a contract against Vivex; and misappropriation and disclosure of trade secrets, in violation of the Defend Trade Secrets Act and the Texas Uniform Trade Secrets Act, against all Defendants.

On April 25, 2022, Direct Biologics filed the instant Application for TRO and a Preliminary Injunction, seeking: (1) an immediate TRO directing McQueen and Vivex to (i) comply with the

noncompete covenants, (ii) return and stop accessing, using, or sharing Plaintiff's confidential and trade secret information, and (iii) prevent spoliation of any evidence, pending consideration of its request for a preliminary injunction; (2) a preliminary injunction hearing no later than 14 days from the date of the application; and (3) entry of a preliminary injunction enjoining McQueen and Vivex from (i) violating the noncompete covenants and (ii) accessing, using, or sharing Direct Biologics' confidential and trade secret information. Dkt. 6 at 8.

Direct Biologics also has filed a Motion for Expedited Discovery seeking to obtain discovery on an expedited basis from Defendants in advance of a preliminary injunction hearing. Dkt. 7.

McQueen opposes the Application for TRO and for Preliminary Injunction and has filed a Motion to Dismiss on the bases of improper venue, lack of personal jurisdiction, and failure to state a claim. Dkt. 12. Defendant Vivex has not made an appearance in the case.

The Court conducted an evidentiary hearing on the Application for Temporary Restraining Order on May 3, 2022. After considering the Application, supporting evidence, and relevant law, the Court finds that the Application should be granted in part.

## II.   Personal Jurisdiction

A district court must have both subject matter jurisdiction and personal jurisdiction over the party against whom a TRO or preliminary injunction is requested. *Enter. Int'l, Inc. v. Corporacion Estatal Petrolera Ecuatoriana*, 762 F.2d 464, 470 (5th Cir. 1985) ("Because Rule 65 confers no jurisdiction, the district court must have both subject matter jurisdiction and in personam jurisdiction over the party against whom the injunction runs, and, when that party is the defendant, this implies either voluntary appearance by him or effective service of process.") (internal quotations omitted); 11A CHARLES ALAN WRIGHT & ARTHUR MILLER, FEDERAL PRACTICE AND PROCEDURE § 2941 (3d ed. 2021 Update) ("[T]he court must have personal jurisdiction over the party against whom equitable relief is sought").

10

Because personal jurisdiction is "an essential element of the jurisdiction of a district court without which the court is powerless to proceed to an adjudication," courts must reach the personal jurisdiction issue before reaching claims on the merits. *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 584 (1999).

### A. Legal Standard

A federal court sitting in diversity may exercise personal jurisdiction over a non-resident defendant if the state's long-arm statute permits an exercise of jurisdiction over that defendant and an exercise of jurisdiction would comport with the requirements of the Due Process Clause of the Fourteenth Amendment. *Sangha v. Navig8 ShipManagement Priv. Ltd.,* 882 F.3d 96, 101 (5th Cir. 2018). Because the requirements of the Texas long-arm statute are coextensive with the requirements of the Due Process Clause, the sole inquiry is whether the Court's exercise of personal jurisdiction over the defendant would be consistent with due process. *Id.* In order for personal jurisdiction to satisfy due process requirements, a Direct Biologics must show that (1) the defendant purposefully availed itself of the benefits and protections of the forum state by establishing "minimum contacts" with the forum state, and (2) the exercise of personal jurisdiction over that defendant does not offend traditional notions of "fair play and substantial justice." *Int'l Shoe Co. v. Wash.*, 326 U.S. 310, 316 (1945). "The Direct Biologics has the burden to make a prima facie showing that personal jurisdiction is proper." *Monkton Ins. Servs., Ltd. v. Ritter*, 768 F.3d 429, 431 (5th Cir. 2014).

A defendant's "minimum contacts" may give rise to either general or specific personal jurisdiction, depending on the nature of the suit and the defendant's relationship to the forum state. *Sangha*, 882 F.3d at 101. A court may assert general jurisdiction over non-resident defendants "when their affiliations with the State are so 'continuous and systematic' as to render them

essentially at home in the forum State." *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011) (quoting *Int'l Shoe*, 326 U.S. at 317). Specific jurisdiction exists "when a nonresident defendant has purposefully directed its activities at the forum state and the litigation results from alleged injuries that arise out of or relate to those activities." *Halliburton Energy Servs., Inc. v. Ironshore Specialty Ins. Co*., 921 F.3d 522, 539 (5th Cir. 2019). Here, Direct Biologics relies on specific jurisdiction over the Defendants.

Specific jurisdiction focuses on the relationship among the defendant, the forum, and the litigation. *Walden v. Fiore*, 571 U.S. 277, 284 (2014). For a state to exercise jurisdiction consistent with due process, the defendant's suit-related conduct must create a substantial connection with the forum state. *Id.* The Fifth Circuit Court of Appeals has articulated a three-step analysis for the specific jurisdiction inquiry:

1. whether the defendant has minimum contacts with the forum state, i.e., whether it purposely directed its activities toward the forum state or purposely availed itself of the privileges of conducting activities there;

2. whether the Direct Biologics' cause of action arises out of or results from the defendant's forum-related contacts; and

3. whether the exercise of personal jurisdiction is fair and reasonable.

*Carmona v. Leo Ship Mgmt., Inc.*, 924 F.3d 190, 193 (5th Cir. 2019). If the Direct Biologics satisfies the first two prongs, the burden shifts to the defendant to make a "compelling case" that the assertion of jurisdiction is not fair or reasonable. *Id.*

"Each defendant's contacts with the forum State must be assessed individually." *Calder v. Jones*, 465 U.S. 783, 790 (1984). "The Constitution does not permit courts "to impute the jurisdictional contacts of each defendant to all the others." *Libersat v. Sundance Energy, Inc.,* 978 F.3d 315, 319 (5th Cir. 2020). "[A] non-resident defendant can only develop minimum contacts with a forum state through 'actions by the defendant himself that create a substantial connection

with the forum State.'" *Halliburton Energy Servs., Inc. v. Ironshore Specialty Ins. Co.*, 921 F.3d 522, 543 (5th Cir. 2019) (*Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985)). Thus, "courts must assess each defendant's contacts with the forum state individually—a substantial connection is not formed by the 'unilateral activity of another party or a third person.'" *Id.*

### B. The Court has Personal Jurisdiction over McQueen

This Court has personal jurisdiction over McQueen because he has purposely availed himself of the benefits of the State of Texas and has sufficient contacts with Texas for this Court to exercise jurisdiction over him. Direct Biologics alleges that McQueen worked for Direct Biologics, a company based in Travis County, Texas, for four years, repeatedly traveled to the company's headquarters in Austin, and directed his employment activities and communications to Direct Biologics' headquarters. Direct Biologics asserts that McQueen breached his employment contracts with his Texas-based employer, and these breaches have caused injury to Direct Biologics *in* Texas. The Court finds that these allegations are sufficient to show that the Court has specific jurisdiction over McQueen.

### C. Direct Biologics Has Not Shown that the Court Has Personal Jurisdiction over Vivex

Direct Biologics fails to sustain its burden to show that the Court has personal jurisdiction over Vivex. Neither Vivex entity is incorporated in Texas, and both have their principal place of businesses in Marietta, Georgia. There is no evidence that Vivex has any offices or employees in Texas or owns any property here. In addition, Vivex was not a party to the contracts at issue. Direct Biologics relies only on conclusory allegations to demonstrate personal jurisdiction over Vivex.

Because it is not clear whether this Court has jurisdiction over Vivex, the Court cannot issue a TRO against Vivex. *See Pizza Hut LLC v. Pandya*, No. 4:19-CV-00726-RWS, 2019 WL 8331437, at *3 (E.D. Tex. Nov. 26, 2019) (denying TRO where Direct Biologics failed to demonstrate court

had personal jurisdiction over defendant); *Singer v. Balzorah El*, No. 3:18-CV-02937-M, 2018 WL 6737676, at *1 (N.D. Tex. Nov. 16, 2018) (same).

## III.   Application for TRO

Direct Biologics seeks a TRO based on its claims that McQueen breached his non-competition covenants contained in the parties' Employment Agreement and Operating Agreement; breached his contractual obligations not to use or disclose its confidential information; and misappropriated highly confidential and trade secret information in violation of the  in violation of the Defend Trade Secrets Act ("DTSA") and the Texas Uniform Trade Secrets Act ("TUTSA").

A TRO is intended to preserve the status quo and prevent irreparable harm. *Granny Goose Foods v. Brd. of Teamsters & Auto Truck Drivers*, 415 U.S. 423, 439 (1974). A court should issue a TRO only if the movant establishes the following four elements: (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable injury if the injunction is not issued; (3) that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted; and (4) that the grant of an injunction will not disserve the public interest. *Clark v. Prichard*, 812 F.2d 991, 993 (5th Cir. 1987). The Fifth Circuit has cautioned repeatedly that a TRO "is an extraordinary remedy which should not be granted unless the party seeking it has clearly carried the burden of persuasion' on all four requirements." *PCI Transp., Inc. v. Fort Worth & W. R. Co.*, 418 F.3d 535, 545 (5th Cir. 2005) (cleaned up).

### A.  Substantial Likelihood of Success on the Merits

 "To show a likelihood of success, the plaintiff must present a prima facie case, but need not prove that he is entitled to summary judgment." *Daniels Health Scis., L.L.C. v. Vascular Health*

*Scis., L.L.C.*, 710 F.3d 579, 582 (5th Cir. 2013). The parties do not dispute that the Court should apply the law of the forum state to this case.[3]

### 1. Breach of Contract

To state a claim for breach of contract under Texas law, a plaintiff must allege: (1) the existence of a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of the contract by the defendant; and (4) damages to the plaintiff as a result of the defendant's breach. *Pathfinder Oil & Gas, Inc. v. Great W. Drilling, Ltd.*, 574 S.W.3d 882, 890 (Tex. 2019).

Direct Biologics alleges that McQueen violated the noncompetition agreements and misappropriated trade secrets in violation of the Employment Agreement and Operating Agreement. The noncompetition agreement in the Employment Agreement prohibits McQueen from working for a direct competitor for one year following termination, Dkt. 6-4 at § 6.1. The Operating Agreement prohibits him from working for a direct competitor for two years anywhere in the United States. Dkt. 6-5 § 17.1 (b). In addition, the Agreements require McQueen not to disclose confidential information and trade secrets to third parties and competitors. Dkt. 6-4 at § 5.4; Dkt. 6-5 § 17.1(a).

"Reasonable covenants not to compete serve the legitimate business interest of preventing departing employees from 'using the business contacts and rapport established' during their employment to take the employer's clients with them when they leave." *D'Onofrio v. Vacation Publ'ns, Inc.*, 888 F.3d 197, 211 (5th Cir. 2018) (citing *Peat Marwick Main & Co. v. Haass*, 818 S.W.2d 381, 387 (Tex. 1991)). A covenant not to compete is enforceable if it: (1) is ancillary to or part of an otherwise enforceable agreement; (2) contains reasonable limitations as to time,

---

[3] The Employment Agreement contains a choice of law provision that it "will be governed by and construed in accordance with the laws of the United States and the State of Texas without reference to its conflict of laws principles." Dkt. 6-4 § 15.4. However, the Operating Agreement states that Wyoming law applies. Dkt. 6-5 § 18.9. Regardless, both parties rely on Texas law.

geographical area, and scope of activity to be restrained; and (3) does not impose a greater restraint than is necessary to protect the goodwill or other business interest of the promisee. Tex. Bus. & Com. Code Ann. § 15.50(a) (West 2009). "[C]ourts have also dispensed with one or more factors entirely when the totality of circumstances indicated that the covenant not to compete was reasonably narrow to protect a company's business interest or goodwill." *M-I LLC v. Stelly*, 733 F. Supp. 2d 759, 799 (S.D. Tex. 2010).

The Texas Supreme Court has held that "otherwise enforceable agreements can emanate from at-will employment so long as the consideration for any promise is not illusory." *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 849 (Tex. 2009). In addition, "if an employer provides confidential information to an employee who has promised in return to preserve the confidences of the employer, then a non-competition covenant executed as part of that agreement is enforceable." *Realogy Holdings Corp. v. Jongebloed*, 957 F.3d 523, 535 (5th Cir. 2020) (citing *Alex Sheshunoff Mgmt. Servs., L.P. v. Johnson*, 209 S.W.3d 644, 655 (Tex. 2006)). Accordingly, the Agreements are enforceable.

A noncompete provision is reasonable when it does not "impose a greater restraint than is necessary" to protect the employer's legitimate business interest. Tex. Bus. & Com. Code § 15.50(a). Regarding time limitations, McQueen is restricted from competing for one year under the Employment Agreement, and for two years under the Operating Agreement. Courts have found such time limitations reasonable. *Gallagher Healthcare Ins. Servs. v. Vogelsang*, 312 S.W.3d 640, 655 (Tex. App.—Houston 2009, pet. denied) ("Two to five years has repeatedly been held as a reasonable time in a noncompetition agreement.").

The permissible breadth of the geographic applicability of a noncompete provision depends both on the nature of the business and the degree of the employee's involvement in the business.

16

*AmeriPath, Inc. v. Hebert*, 447 S.W.3d 319, 335 (Tex. App.—Dallas 2014, pet denied). This often means that a noncompete provision should be limited to the territory where the employee worked. *Id.* However, when an employee is involved in the higher levels of company management, greater geographic restrictions are often justified because the employee's knowledge of and experience with the company extend beyond the location where he worked. *Id.* Thus, "courts will uphold a national or global covenant whose scope exceeds an employee's territory when the scope is justified by the business interest underlying the covenant." *Accruent, LLC v. Short*, No. 1:17-CV-858-RP, 2018 WL 297614, at *4 (W.D. Tex. Jan. 4, 2018), *appeal filed*, No. 18-50075 (5th Cir. Jan. 29, 2018); *see also Providence Title Co. v. Truly Title, Inc.,* 547 F. Supp. 3d 585, 602 (E.D. Tex. 2021) (same), *appeal filed*, No. 21-40578 (5th Cir. Aug. 3, 2021). In addition, Texas courts have upheld nationwide geographic limitations in non-compete agreements when it has been clearly established that the business is national in character" *Vais Arms, Inc. v. Vais*, 383 F.3d 287, 296 n. 20 (5th Cir. 2004).

McQueen's Employment Agreement covers "any state of the United States of America in which [Direct Biologics] does business," while the Operating Agreement applies to "anywhere in the United States of America or territories thereof." Dkt. ¶ 6.1; § 17.1(a). The Court finds this geographical scope is reasonable, given Direct Biologics' nationwide sales, the small number of competitors in the industry, and McQueen's role as a senior leader with access to information and oversight responsibilities over both of Direct Biologics' product lines. *See Accruent*, 2018 WL 297614, at *4 (upholding nationwide geographic restriction on competition where necessary to protect Direct Biologics' confidential information); *McKissock, LLC v. Martin*, 267 F. Supp. 3d 841, 857 (W.D. Tex. Nov. 10, 2016) (finding non-compete covenant reasonable where employee had clients nationwide and had access to prior employer's confidential, proprietary, and trade

secrets information as a high-level employee); *Daily Instruments Corp. v. Heidt*, 998 F. Supp. 2d 553, 567–68 (S.D. Tex. 2014) (upholding covenant extending to every country in which the employer did business where global customer base was "very narrow" and high-level employee had access to confidential information about customers and projects outside his territory); *Sheshunoff Mgmt. Servs.* 209 S.W.3d at 656-67 (holding that non-compete restricting employment in any geographic location was reasonable where defendant was high-level employee and could have capitalized on goodwill that he helped develop).

The scope of activities restricted by the Employment Agreement and Operating Agreement also are reasonable. Direct Biologics alleges that McQueen had unfettered access to all aspects of Direct Biologics' business, including proprietary and confidential information about existing and future product lines, specialized manufacturing techniques critical strategic information concerning regulatory approvals and marketing, and key contacts necessary to convert the scientific concepts into medical products. In addition, Direct Biologics alleges that the nature of the industry is such that only a handful of competitors nationwide have the knowhow and experience to market allograft solutions and/or seek FDA approval for the use of Direct Biologics' technology in medical applications. Accordingly, it is reasonable that under the Employment Agreement, McQueen is barred from providing services similar to those he offered his former employer for "any entity that competes with the Business of" Direct Biologics. Similarly, it is reasonable that the Operating Agreement prevents McQueen from joining those "enterprise[s] conducting business activities that are the same or substantially similar to those of" Direct Biologics' while McQueen remains a Member of the LLC.

Finally, the Court finds that the applicable covenants are narrowly tailored to protect Direct Biologics' business interest in safeguarding its trade secrets, goodwill, and other legitimate

business interests. Based on the foregoing, the Court finds that Direct Biologics is likely to succeed on the merits of its breach of contract claim.

### 2.      Misappropriation of Trade Secrets

Direct Biologics also allege that McQueen violated the DUTSA and TUTSA by using or misappropriating Direct Biologics' confidential and proprietary information.

"Under both the DTSA and TUTSA, a trade secret is defined as information the owner has taken reasonable measures to keep secret and which derives independent economic value from not being generally known or readily ascertainable through proper means." *TFC Partners, Inc. v. Stratton Amenities, LLC*, No. 1:19-CV-58-RP, 2019 WL 369152, at *2 (W.D. Tex. Jan. 30, 2019) (citing TEX. CIV. PRAC. & REM. CODE § 134A.002(6); 18 U.S.C. § 1839(3)). Misappropriation under both statutes includes (1) "disclosure or use of a trade secret of another without express or implied consent by a person who . . . used improper means to acquire knowledge of the trade secret" and (2) "acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means." TEX. CIV. PRAC. & REM. CODE § 134A.002(3); 18 U.S.C. § 1839(5). "Improper means" include the "breach or inducement of a breach of a duty to maintain secrecy." TEX. CIV. PRAC. & REM. CODE § 134A.002(2); 18 U.S.C. § 1839(6)(A).

To determine whether a trade secret exists under Texas law, court examine:

> (1) the extent to which the information is known outside of his business;
> (2) the extent to which it is known by employees and others involved in his business;
> (3) the extent of the measures taken by him to guard the secrecy of the information;
> (4) the value of the information to him and to his competitors;
> (5) the amount of effort or money expended by him in developing the information;
> (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

*In re Bass*, 113 S.W.3d 735, 739 (Tex. 2003). "A trade secret must actually be a secret: the owner must take 'reasonable measures under the circumstances to keep the information secret' and the information must derive economic value from not being generally known or readily ascertainable through proper means." *TFC Partners*, 2019 WL 369152, at *3 (citing TEX. CIV. PRAC. & REM. CODE § 134A.002(6)). "Texas law provides that both actual and threatened misappropriation may be enjoined." *Id.* (citing Tex. Civ. Prac. & Rem. Code § 134A.003(a)). Therefore, "the weight of case law supports the entry of an injunction upon a showing that a defendant probably, rather than actually, disclosed trade secrets." *Id.*; *see also Cardoni v. Prosperity Bank*, 805 F.3d 573, 590 (5th Cir. 2015) (holding that a district court correctly "made an individualized assessment of whether disclosure had occurred or was likely to occur in this case"). Such a showing can be made by proving that a defendant is "in possession of the information and is in a position to use it." *Fox v. Tropical Warehouses, Inc.*, 121 S.W.3d 853, 860 (Tex. App.—Fort Worth 2003, no pet.). The party claiming secrecy has the burden to prove secrecy. *Id.* "At this preliminary stage, a court does not determine that the information at issue is a trade secret, only 'whether the applicant has established that the information is entitled to trade-secret protection until the trial on the merits.'" *TFC Partners*, 2019 WL 369152, at *3 (quoting *Ctr. for Econ. Justice v. Am. Ins. Ass'n*, 39 S.W.3d 337, 343 (Tex. App.—Austin 2001, no pet.)).

The Court finds that Direct Biologics has established a substantial likelihood that it will prevail on the merits of its DUTSA and TUTSA claims against McQueen. Direct Biologics has made a prima facie showing that McQueen has misappropriated information that falls within the definition of a trade secrets. In addition, Direct Biologics requires employees to sign non-compete agreements and agree not to disclose confidential information, guards electronic access points to

its data, maintains confidential information on a secure network, and controls employee access to confidential information.

Moreover, there is a substantial likelihood that Direct Biologics will be able to prove that McQueen has misappropriated these trade secrets. Direct Biologics has presented evidence that McQueen used a link he created between his personal Dropbox account and Direct Biologics' file storage system to save copies of Direct Biologics' files into folders under his exclusive control. Direct Biologics alleges that these files include highly sensitive and valuable trade secrets, such as documents concerning its intellectual property, product pricing, suppliers and manufacturing, and its secret clinical trial protocols. Direct Biologics alleges that many of these documents are explicitly marked "Confidential." Direct Biologics further has provided evidence that McQueen still possesses documents containing Direct Biologics' confidential and proprietary information and has knowledge of Direct Biologics' trade secrets. Direct Biologics further alleges that McQueen has disclosed and plans to disclose this information to Vivex, in violation of his contractual and statutory obligations.

Based on the foregoing, the Court finds that Direct Biologics has shown that there is a substantial likelihood that it will prevail on its misappropriation of trade secrets claims.

## B.  Irreparable Injury

To satisfy the second element of the TRO standard, Direct Biologics must demonstrate that if the Court denied the grant of a preliminary injunction, irreparable harm would result. "To show irreparable injury if threatened action is not enjoined, it is not necessary to demonstrate that harm is inevitable and irreparable. The plaintiff need show only a significant threat of injury from the impending action, that the injury is imminent, and that money damages would not fully repair the harm." *Humana, Inc. v. Jacobson*, 804 F.2d 1390, 1394 (5th Cir. 1986).

Direct Biologics argues that it will suffer irreparable harm in this case if the TRO is not issued because McQueen possesses critical knowledge about Direct Biologics' business and products and there is a substantial danger that he has disclosed or will disclose that information to Vivex, which will in turn use that information to develop products in direct competition with Direct Biologics' line of products. In addition, Direct Biologics further argues that it will be irreparably harmed by the misappropriation of its confidential and trade secret information.

Injury resulting from the breach of non-competition provision "is the epitome of irreparable injury, so enforcement appears to be the rule rather the exception." *Sirius Computer Sols., Inc. v. Sparks*, 138 F. Supp. 3d 821, 841 (W.D. Tex. 2015) (citation omitted). Accordingly, "[p]roof that a highly trained employee is continuing to breach a non-competition provision gives rise to a rebuttable presumption that the applicant is suffering irreparable injury." *Id.*; *see also Ruscitto v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 777 F. Supp. 1349, 1354 (N.D. Tex. 1991) (holding that plaintiff showed threat of irreparable injury based on breach of the noncompetition agreement), *aff'd*, 948 F.2d 1286 (5th Cir. 1991).

In addition, "Texas courts have long recognized that the disclosure of trade secret information constitutes irreparable injury as a matter of law." *Sunbelt Rentals, Inc. v. Holley*, No. 3:21-CV-3241-N, 2022 WL 1049468, at *6 (N.D. Tex. Apr. 7, 2022) (citing *Williams v. Compressor Engineering Corp.*, 704 S.W.2d 469, 470–71 (Tex. App.—Houston [14th Dist.] 1986, writ ref'd n.r.e.)), *filing appeal*, No. 22-10369 (5th Cir. April 18, 2022); *see also Heil Trailer Int'l Co. v. Kula*, 542 F. App'x 329, 336 (5th Cir. 2013) ("Texas courts have frequently found that irreparable harm is likely in cases where trade secrets have been misappropriated.") (collecting cases). Thus, "[w]hen a defendant possesses trade secrets and is in a position to use them, harm to the trade

secret owner may be presumed." *TFC Partners*, 2019 WL 369152, at *4 (quoting *IAC, Ltd. v. Bell Helicopter Textron, Inc.,* 160 S.W.3d 191, 200 (Tex. App.—Fort Worth 2005, no  pet.).

The Court finds that Direct Biologics has established a likelihood of irreparable harm based on the prima facie evidence presented at the hearing that McQueen likely possesses Direct Biologics' trade secrets and confidential information and is in a position to use them. *TFC Partners*, 2019 WL 369152, at *4 (holding that irreparable harm may be presumed based on prima facie evidence that defendants possessed trade secrets and were in a position to use them); *AHS Staffing, LLC v. Quest Staffing Grp., Inc.*, 335 F. Supp. 3d 856, 873 (E.D. Tex. 2018) ("[Plaintiff] faces irreparable harm by Defendants' misappropriation of trade secrets because Defendants can benefit from [plaintiff's] trade secrets without first investing the time, expense, and labor necessary to research and compile the confidential information in the Database.").

### C.  Balance of Harm

When deciding whether to grant a preliminary injunction, "courts must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). "Notably, courts consider the threat of disclosure of the trade secrets by defendants, whether the injunction will effectively destroy a party's business, and whether denial will cause a loss of current market share or simply reduce prospects for expansion." *AHS Staffing*, 335 F. Supp. 3d at 873. In addition, in cases where an injunction would enforce the terms an employment agreement, courts have found "it is not imposing a hardship on [the former employee] that exceeds the terms to which she has already agreed." *Johnson Serv. Grp., Inc. v. Olivia France*, 763 F. Supp. 2d 819, 831 (N.D. Tex. 2011).

The Court finds that Direct Biologics will suffer greater harm if the Court does not issue the injunction than McQueen will endure if the Court does grant relief. The balance of harms tips in Direct Biologics' favor because the potential loss of trade secrets and status as the only company who makes certain proprietary products outweighs the burden associated with complying with state and federal law. *See Sunbelt Rentals*, 2022 WL 827126, at *8 ("Continued violation of the agreement will impose substantial impairment of [plaintiff's] goodwill, precisely the interest it sought to protect by means of the restrictive covenants and confidentiality obligation."). Moreover, the burden imposed by a temporary injunction goes no further than the terms to which McQueen voluntarily consented. *See Id.* ("[T]the burden imposed by a temporary injunction goes no further than the terms to which Holley voluntarily consented.").

### D.  Public Interest

Finally, the Court finds that depriving Direct Biologics of the allegedly misappropriated trade secrets serves the public interest by furthering the purposes of the DUTSA and TUTSA. *TFC Partners*, 2019 WL 369152, at *4. In addition, "it is in the public interest to uphold contracts and to enforce a remedy to which the parties have expressly agreed." *Johnson Serv. Grp.*, 763 F. Supp. 2d at 831.

### IV.    Conclusion

For the foregoing reasons, and as stated on the record, the Court enters some of the injunctive relief Direct Biologics seeks. **IT IS THEREFORE ORDERED** that Direct Biologics, LLC's Opposed Application for Temporary Restraining Order and a Preliminary Injunction (Dkt. 6) and Direct Biologics, LLC's Opposed Motion for Expedited Discovery (Dkt. 7) are **GRANTED IN PART and DENIED IN PART**.

1.  Defendant Adam McQueen is enjoined from:

    a. Employment or engagement, as either employee, consultant, contractor or otherwise, with any person or entity in direct competition with Direct Biologics, including, without limitation, Vivex Biologics, Inc ("Vivex");

    b. Accessing, using, transmitting, copying, or disclosing to Vivex (directly or indirectly) or any other entity any confidential or trade secret communications, information, data, or documents received, relating to or originating from or obtained directly or indirectly from, Direct Biologics. To the extent McQueen has already shared any such information with Vivex; McQueen is directed to take immediate reasonable steps to identify the information and documents in Vivex's possession, and seek the immediate return of the information; and

    c. Destroying, altering or removing from any personal electronic device, personal email account, or cloud-based application which may contain or have contained, any documents, communications, data, or tangible things originating from, relating to, or obtained directly or indirectly from Direct Biologics. This includes the preservation of any personal mobile device, computer or laptop, email account (including admcqueen@gmail.com), cloud-based application or storage account (including, without limitation, Dropbox), and any application used to share information (including iMessage, Facebook Messenger, WhatsApp, Twitter, Signal, Telegram, WeChat, etc).

2. McQueen is **ORDERED** to serve his responses and documents responsive to Direct Biologics' First Set of Requests for Production to Defendant Adam McQueen and First Set of Interrogatories to Defendant Adam McQueen (Dkts. 7-1 and 7-2), on or before **Friday, May 6, 2022 at 5 p.m.**

3.  McQueen is **ORDERED** to appear for a deposition lasting no more than three hours via Zoom or other remote videoconferencing means at a time mutually agreeable to the parties on or before **Wednesday, May 11, 2022.**

4.  The Court **FURTHER GRANTS** Direct Biologics' request to enter the proposed Protective Order (Dkt. 7-6).

5.  All other relief sought by Direct Biologics not expressly granted is denied.

6.  The Court will conduct a preliminary injunction hearing on **May 16, 2022 at 1:30 p.m.** The hearing will take place at the United States District Courthouse, 501 West Fifth Street, Courtroom 6, Austin, Texas 78701.

7.  Unless extended by the Court, this order expires on May 16, 2022 at 5 p.m. FED. R. CIV. P. 65(B)(2).

**SIGNED** on May 4, 2022.

_____
SUSAN HIGHTOWER
UNITED STATES MAGISTRATE JUDGE